Scileppi, J.
In the early morning hours of March 16, 1965 defendant George McKie reported to a neighborhood patrolman that he had discovered the body of Manella Morris in the second floor apartment of a two-family house located at 65 Walter Avenue, Inwood, Nassau County. The defendant had spent the night of March 15 in the first floor apartment which had been rented by his friend. He allegedly discovered the body when he went to the Morris apartment to use the toilet, since the toilet in the first floor apartment was not working.
Detective Matthew Bonora and other members of the homicide squad soon arrived at the scene of the crime and went upstairs to view the body. The face and head of the deceased were completely obscured; the head was covered with a blanket and rope was tied securely around the neck. In the course of questioning McKie outside the house, Detective Bonora asked bim what he thought the police might do with respect to this serious situation. According to the detective, the defendant replied that: “ We are going to have to stop whoever is going around hitting these people in the head. ’ ’
*22 At this point no one had seen the victim’s head, and they all thought that death had been caused by strangulation. Detective Bonora and Dr. Lukash, the medical examiner, immediately went upstairs and cut the ropes around the neck of the deceased. Upon removing the blanket, it was revealed that it was not a strangulation but that the deceased had died from a fractured •skull. The defendant naturally became the prime suspect. Concededly, defendant was taken to police headquarters and interrogated extensively about his connection with the homicide. The interrogation proved fruitless, for he neither confessed nor made a single damaging admission.
Shortly thereafter, however, as a result of evidence obtained during the over-all investigation, the defendant was arrested and charged with several unrelated misdemeanors (gambling and sale of alcoholic beverages without a license). The District Court Judge assigned Patrick Adams, Esq., to represent defendant on the misdemeanor charges. Defendant pleaded guilty to one of the charges in satisfaction of all and received a jail sentence of six months which he served.
During all this time Detective Bonora and others continued the investigation of the Morris homicide but were unable to uncover any evidence to link McKie with the crime. Following McKie’s release from jail on the misdemeanor charges, Detective Bonora approached him on many occasions to question him about the homicide. This caused McKie to get in touch with Adams, the attorney who had represented him earlier. Adams told Detective Bonora not to examine or talk to McKie. The Huntley hearing minutes proved, and it is not disputed by the People, that Adams continued to represent McKie for all purposes including the investigation of the homicide. As late as April 21,1966, when Detective Bonora visited McKie’s apartment, Adams told him over the telephone: “ I told you once, I told you twice, I told you many times not to examine or not to talk to McKie. ’ ’
About one month later, on May 18, 1966, Detective Bonora, Detective Oliva and Patrolman Monroe, who never ceased in their efforts to unravel the truth and build their case against their prime suspect, set out to find McKie and again question him. Detective Bonora testified that they spotted McKie on the street and followed him in their cari McKie entered a small *23 building and the officers parked at the curb. Patrolman Monroe got out of the car and went into an apartment house near the building that McKie entered, in order to investigate a report of a prowler. When McKie came out he approached the car, leaned in the window and said to Detective Bonora, “ It’s not going to work, Matt. When are you guys going to stop bugging me? ” At that point Patrolman Monroe came out of the building and McKie began an altercation with him, shouting and yelling. As the argument became heated McKie said to Monroe, “ You can be killed too”, and Monroe replied, “ You’re not dealing with any little old lady now.” Observing the intensity of this verbal duel, Bonora and Oliva got out of the car and Bonora .said to McKie, “ You seem to be so brave now; you weren’t so brave when you killed that little old lady ” to which McKie replied, “ Sure I did it, but you guys can’t prove it.”
As a result of this statement, McKie was arrested and charged with the murder of Mrs. Morris.
At a Huntley hearing held prior to the trial, McKie’s statement—made in the course of the argument with the police — was found to be voluntary. Accordingly, at the trial, the prosecutor was permitted, over objection, to ask the arresting officers about the events of May 18, 1966 and to recall what the defendant had .said at that time.
On this appeal McKie argues that the introduction of this testimony constituted reversible error because his statement was obtained in violation of the Sixth Amendment right to counsel. Primary reliance is placed upon the following language contained in People v. Arthur (22 N Y 2d 325, 329): “ Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the-defendant’s right to counsel (People v. Vella, 21 N Y 2d 249). There is no requirement that the attorney or the defendant request the police to respect this right of the defendant. ’ ’
In our opinion defendant’s reliance upon the Arthur case is misplaced. The language of Arthur, the facts upon which it was decided and the cases relied upon in the opinion make quite clear—even upon a cursory reading—that the rule laid down in that case is operative only when the police have taken an *24 accused into custody or deprived him of his freedom of action in any significant way (see Miranda v. Arizona, 384 U. S. 436).
In order to fully understand the rule of Arthur, it is instructive to examine the nature of the right to counsel. The language of the Federal Constitution guarantees the right to counsel in any criminal prosecution, and our own State Constitution guarantees the right to counsel in any trial in any court. Through judicial interpretation this fundamental right to counsel had been expanded so that it applies not only at the trial, where the need for counsel is most obvious, but “ at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected ” (Mempa v. Rhay, 389 U. S. 128, 134; emphasis added). Almost a decade ago this court held that an arraignment or indictment marks the beginning of the criminal proceeding against the accused. It is the commencement-of the judicial stage during which the accused has a constitutional right to counsel (People v. Meyer, 11 N Y 2d 162; People v. Waterman, 9 N Y 2d 561; People v. Di Biasi, 7 N Y 2d 544). The reason for expanding the right to counsel to the postarraignment or indictment period was best explained in People v. Waterman (supra, at p. 566): “ The People would manifestly not be permitted at .the trial to call the defendant to the witness stand to establish their case through his testimony * * * By the same token, they may not circumvent the defendant’s privilege against self incrimination by introducing into evidence inculpatory statements obtained from him (following indictment [or arraignment]) at a private examination prior to the trial ’ ’.
In other words, in order to protect the accused’s Fifth Amendment privilege against self incrimination, the Sixth Amendment right to counsel had to attach during the pretrial period after the judicial proceeding had commenced either by indictment or arraignment.
Perhaps the most significant case in this area, however, is People v. Donovan (13 N Y 2d 148). For it is Donovan which recognized the right to counsel during detention even though a defendant had not been indicted or arraigned. Indeed, it may fairly be said .that Donovan is the seed from which sprang the Supreme Court’s decisions in Escobedo v. Illinois (378 U. S. 479) and Miranda v. Arizona (supra).
*25 In Donovan the defendant was arrested, taken to a police station and was there interrogated by the police and a prosecutor. Donovan made two confessions — one orally and the other in writing. The written confession was obtained after the police had refused to allow an attorney, retained by Donovan’s family for him while he was in custody, to see or speak with him. In holding that it was reversible error to admit the written confession into evidence at Donovan’s trial, we said: “ we are of the opinion that, quite apart from the Due Process Clause of the Fourteenth Amendment, this State’s constitutional and statutory provisions pertaining to the privilege against self incrimination and the right to counsel (N. Y. Const., art. I, § 6; Code Crim. Pro., §§ 8, 188, 308, 699), not to mention our own guarantee of due process (N. Y. Const., art. I, § 6), require the exclusion of a confession taken from a defendant, during a period of detention after his attorney had requested and been denied access to him.” (People v. Donovan, supra, at p. 151.)
More important, however, for purposes -of the present case, is the fact that in Donovan we held that during a period of custodial interrogation the right to counsel and the privilege against self incrimination converge, ‘ ‘ for one of the most important protections which counsel can confer while his client is being detained by the authorities is to preserve his client’s privilege against self incrimination and prevent the deprivation of that and other rights which may ensue from, such detention ” (People v. Donovan, supra, at pp. 151-152; italics supplied). Accordingly we made it clear that “we condemn continued incommunicado interrogation of an accused after he or the lawyer retained by him or his family has requested that they be allowed to confer together ” (People v. Donovan, supra, at p. 153).
The cases which followed Donovan, including People v. Arthur (supra), were merely variations of the same theme. Thus in People v. Failla (14 N Y 2d 178), we held that the Donovan rule renders inadmissible the entire confession made by the accused while under arrest and in custody even though part of the confession had been made before counsel had arrived and had been denied access to the accused. And in People v. Gunner (15 N Y 2d 226), where the defendant was arrested in Los *26 Angeles, we held inadmissible all statements made to police after the New York authorities had been advised by an attorney that he represented the defendant and did not want any statements taken from him.
People v. Vella (21 N Y 2d 249) was another case governed by the Donovan rule. There the defendant had been arraigned on a separate but related charge in New York County. Counsel had been assigned. At the conclusion of the. arraignment, he was released on his own recognizance but was immediately arrested by State Troopers from Suffolk County who knew that the defendant was represented by counsel. The troopers turned the defendant over to State Police in Suffolk County and a confession was obtained. We held that under the Donovan rule the confession was inadmissible because, having had knowledge that the defendant—who was then in custody—was represented by an attorney, the police were not privileged to question him without the attorney’s consent.
People v. Arthur (supra), the case upon which the defendant herein places sole reliance, is but the most recent in the line of cases discussed above which have applied the Donovan rule in situations in which the defendant is in custody.
In Arthur the defendant had already been arrested when his attorney showed up at the station house. After being permitted to speak with his client, the attorney left. The next morning in the absence of the attorney .the police interrogated the defendant and obtaind a confession. Relying on People v. Donovan (supra), People v. Failla (supra), People v. Gunner (supra) and People v. Vella (supra), we held that the confession was inadmissible because “ Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant’s right to counsel ”.
Arthur simply recognized, as did the cases which came before it, that the criminal proceeding commences with formal custody and, if an in-custody defendant in fact is represented by counsel, and the police know it, they may not question him in the absence of counsel.
Arthur did not lay down a rule that, whenevér a suspect is represented by counsel, the police may not question him except *27 in the presence of counsel. Indeed no ease either in this State or in the Federal jurisdiction has gone so far.
In all candor, it must he said that Donovan and its progeny are discriminatory cases in the sense that they recognize a constitutional >right to counsel during custodial interrogation only for those defendants who in fact have counsel. Thus it was hut a short step from our decision in Donovan to the Supreme Court’s decision in Miranda v. Arizona (supra). As Dean J eróme Prince observed in his treatise on the law of evidence, written almost two years before Miranda was decided: “ The Donovan rule may be criticized as too narrow. If that rule is rooted in a right of the accused to the assistance of counsel in the pre-arraignment period, there is no reason why that right should be limited to an accused who has the means and the wisdom, or whose family has the means and the wisdom, to employ counsel. People v. Donovan, supra, 13 N. Y. 2d at 162, 193 N. E. 2d at 636, 243 N, Y. S. 2d at 852 (dissenting opinion of Foster, J.). -But perhaps the Donovan case is the prelude to a new rule yet to come that every arrested suspect, prior to questioning by police or prosecutor, must be advised of his right to counsel and warned that if he speaks, what he says may be used in evidence against him. ’ ’ (Richardson, Evidence [Prince, 9th ed.], § 335, p. 324.)
In Miranda the Supreme Court was concerned with statements made during custodial interrogation. This was made quite clear when the court said: ‘‘ The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first 'Subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way. * * * Under the system of warnings we delineate today or under any other system which may be devised and found effective, the safeguards to be erected about the privilege must come into play at this point ” (supra, at p. 477).
Moreover,' the Miranda decision makes it clear that the requirement of advising a person who is in custody of the Sixth Amendment right to counsel is mandated so that an accused’s Fifth Amendment privilege against self incrimination is protected: "The circumstances surrounding in-custody interroga *28 tionican operate very quickly to overbear the will of .one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today ” (supra, at p. 469).
This essentially was the view that we had earlier expressed in Donovan. In the instant case, it was found at the Huntley hearing—and we agree — that at the time the defendant blurted out the admission “ I did it, but you guys can’t prove it,” he was neither in custody nor deprived of his freedom in any significant way. Nor can it be said that as a “ reasonable man ’ ’ defendant could have believed that he was so deprived (see People v. Rodney P. [Anonymous], 21 N Y 2d 1). He was well aware of.his rights, having consulted with his attorney several times about the police investigation. Significantly it was the defendant who initiated the verbal duel, not the police. He simply could have walked away when he saw them, but instead he approached the car and started the conversation. It was the defendant who commenced the verbal attack upon Patrolman Monroe and it may be fairly said that the admission which resulted from the argument was the product of the defendant’s own bravado.
It is true that the police went looking for the defendant in order to question him, but persistence in solving crime should not be discouraged. There is nothing in this record to indicate any unfair or coercive action by the police which resulted in the spontaneous admission made by defendant. From all that appears, it was the defendant who commenced the argument and the response of these officers, who for months suspected him to be the murderer of Mrs. Morris, was quite natural under the circumstances.
In sum, the defendant’s Sixth Amendment right to counsel which protects the Fifth Amendment privilege against self incrimination was not violated because the defendant was neither in custody nor physically deprived of his freedom in any significant manner.
The fact that .the police knew that the defendant was represented by counsel is not significant, for no case has extended the constitutional right to counsel to a defendant who is neither in custody nor deprived of his freedom. To conclude otherwise *29 would extend Miranda and the Donovan line of cases far beyond their letter and spirit. Indeed the rule contended for by the defendant herein would eventually require Miranda warnings whenever the police question any suspect regardless of custody or deprivation of freedom. For if this defendant, who was not subjected to custodial interrogation within the meaning of Miranda, had a constitutional right to counsel simply because he in fact had counsel at a time when he was a suspect within the framework of general police investigation, then we must hold, as a matter of fairness — or indeed perhaps as a matter of equal protection of the law — that every suspect who is questioned by the police, even in the most uncoercive atmosphere, has a constitutional right to counsel and has the right to be so informed and to the assignment of counsel if he so chooses. Such a rule would place an intolerable burden upon law enforcement. The purpose of the right to counsel requirements is not to make a conviction impossible; rather it is to assure the protection of all the defendant’s constitutional guarantees, especially the privilege against self incrimination, in order that a conviction be obtained fairly under the Constitution. Restrictions should not be placed upon the police unless they are necessary to secure these rights. Undoubtedly it would be to a defendant’s advantage to exclude incriminatory statements obtained at a time when he was not subject to custodial interrogation, but that is not the question. Such a rule would not further any constitutionally protected right and would only impair society’s effort to prosecute those who violate its laws.
Accordingly, the judgment appealed from should be affirmed.