Melvyn Tanenbaum, J.
A Huntley hearing was held pursuant to an order dated December 13, 1973.
FINDINGS OF FACT
On July 17, 1973 at approximately 10:30 p.m. Scott Pinzón, an infant with serious and undetermined traumatic injuries, was admitted to Southside Hospital, Bay Shore, New York. Detective Salvatore Franco, of the Suffolk County Police Department, was called to the hospital at approximately 10:40 p.m. and spoke with the physician treating the infant and at about 11:00 p.m. questioned the parents to determine the nature and causation of the injuries and whether the infant was a hemophiliac. He was advised that the child had not fallen and was not a hemophiliac.
Detective Franco gave this information to Dr. Markowitz and was informed that blood drawn from the infant’s stomach *438 was found to be a few days old. He then returned to further question the parents about events that occurred at an earlier date, without securing additional information.
Learning that the infant was going to the operating room, Detective Franco took a statement from Mrs. Pinzón while his partner, Detective Eaton, took a statement from the defendant. Thereafter, Detective Franco continued questioning the Pinzons stating that the information would aid in the treatment of the child. Following the physician’s prognosis that the severity of the infant’s injuries would result in the infant’s death, Detective Franco asked Mr. and Mrs. Pinzón to accompany him to a hospital office cubicle. He then advised the Pinzons of the warnings set out in Miranda v Arizona (384 US 436).
Upon questioning during a 20-minute period, defendant said, "I hit child to discipline him”; but did not respond to the question; "Did you hit him in the stomach”? The Pinzons were not detained at the conclusion of this session.
The following morning (July 18, 1973), at the hospital, Detective Wykoff was advised of the imminent death of the infant. Wykoff, when directed by his superiors, asked defendant Pinzón to accompany him to the local police precinct; which he did about 11:00 a.m. He did not handcuff or place defendant under arrest. Detective Wykoff advised defendant of his Miranda rights and that he was free to leave but that it would not help the investigation if he did; and elicited the information that defendant was a teacher and worked with delinquent children; that certain injuries to infant’s hand were from water in a tub and that defendant disclaimed any knowledge about the other traumatic injuries to the infant’s abdomen.
At approximately 11:15 a.m. Detective Wykoff was advised of the infant’s death. He informed the defendant who asked Wykoff to leave the room so that he could be alone for a time. Thereafter Wykoff was instructed to bring defendant to headquarters, which he did between the approximate times of 1:10-1:20 p.m.
Detective Rosenthal of Homicide Squad, after advising Pinzón of his rights, questioned him in a locked room and after approximately 35 minutes was told by the defendant "I hit him with my hand because he wouldn’t stop crying”, "I hit him in the side”, and in response to the question by Detective *439 Tohill "How many times, more than five times?” answered "Probably”.
The defendant claims that Leo Otis, an attorney, advised the Police Department he was defendant’s attorney at 12:47 p.m. and that all statements obtained thereafter should be suppressed.
Mr. Otis testified that he was an attorney admitted to practice in 1937; he was the former employer of defendant’s wife; on July 18, 1973 he called the Suffolk County Police Department six times; at 12:57 p.m. he spoke with a male police officer and advised him he was Pinzon’s attorney and he wanted questioning stopped; at 3:58 p.m. he spoke with Detective Rosenthal and was advised that no further questions would be asked.
Defendant’s Exhibit G, Mr. Otis’ phone bill, shows that he called area code 516 265-5000 on July 18, 1973 at 12:47 p.m.; 12:53 p.m.; 12:54 p.m.; 3:58 p.m.; 5:16 p.m. and 5:32 p.m. The first call lasted five minutes, the second and third calls were one minute each and the fourth call was six minutes.
Captain Stona is the Communications Officer for the Suffolk County Police Department. He testified that 516 265-5000 is the central switchboard number covering seven detective squads and six precincts; his duty log showed no problem calls from 12 noon to 1 p.m. on July 18, 1973, although he was in the building the entire day and any problem calls would have been relayed to him by the female civilian switchboard operators.
Mr. Otis’ testimony was that he was not sure where the defendant was, or on what charge he was being held, that he was not familiar with Suffolk County Police procedure and did not ask for any specific police officer, detective squad or precinct but asked to be connected with Mr. Pinzón. His call did not result in his speaking to Mr. Pinzón, any police officer he could identify or to the duty officer in charge of problem calls.
The record further indicates, although Mr. Ótis was apprized of defendant’s involvement before noon, he did not call the police department until 12:47. He did not get the name of the person to whom he allegedly spoke on his first call and the two additional calls he made immediately thereafter and despite getting the "run-around” he did not ask the name of anyone giving him the "run-around” with the excuse that he "omitted it”.
*440 It is incredible, as a matter of law, that a mature attorney with some 37 years of experience failed to obtain the name of some official who would comprehend the nature of his call, during any of the three calls directed to the department even though he concluded he was being misled.
In view of the foregoing, the court, after careful reflection, must reject Mr. Otis’ testimony that he spoke with a police officer prior to 3:58 and determines that while the witness spoke to an employee answering the telephone i.e. the switchboard operator he did not contact a responsible police official.
CONCLUSIONS OF LAW
(1) The first two questionings of the defendant at Southside Hospital on July 17, 1973 at about 11:00 p.m. and the taking of his statement were on-the-scene interrogations and required no Miranda warnings (People v Yukl, 25 NY2d 585).
(2) The defendant was adequately advised of his Miranda rights on each subsequent questioning and proceeded to knowingly and intelligently waive same and make voluntary statements.
(3) The defendant was not in custody until 1:20 p.m. on July 18, 1973, when he was taken from the local police precinct to headquarters and placed in a locked room. At this point the focus of the investigation centered on the defendant and he was deprived of his freedom in a significant way. (United States v Hall, 493 F2d 904; Miranda v Arizona, 384 US 436, supra; People v Yukl, supra.)
In considering the question of custody the court has taken into consideration the defendant’s profession as a school teacher, his unrestricted freedom on July 18, 1973 from 1:30 a.m. to 10:45 a.m.; that he was not put under any restraint and was free to leave while with Detective Wykoff.
(4) "Criminal proceeding[s] commence with formal custody and, if an in-custody defendant in fact is represented by counsel, and the police know it, they may not question him in the absence of counsel”. (People v McKie, 25 NY2d 19, 26.) Unlike the attorney in Escobedo v Illinois (378 US 478, 481) who spoke with the police chief and had "a conversation with every police officer I could find”, or the attorney in People v Gunner (15 NY2d 226) who telephoned the Nassau County Police Chief, the credible evidence fails to establish that the attorney spoke with anyone other than the civilian switch *441 board operators. This court, not unmindful of the dictates of Gunner that the defendant’s right to counsel is not dependent upon "mechanical” or "arbitrary” requirements, finds that the assertion of the Sixth Amendment rights to counsel which protects the Fifth Amendment privelege against self incrimination must be made to a responsible member of the police department either by the defendant or his attorney.
"The rule of Arthur is not applicable unless there is evidence of conduct as there was in Vella which would indicate an intention to victimize a defendant or outwit his attorney in order to carry out an inquiry.” (People v Robles, 27 NY2d 155, 159.) (See, Matter of Leopold v Tofany, 68 Misc 2d 3, where the court considered the denial of the right of an attorney to see his client and People v Saturnialo, 42 AD2d 721, where the determination revolved around the failure of police to notify the defendant that his attorney wanted no further questioning.) No contention has been made in the instant case that the switchboard operators "sealed off the most likely avenue by which the assistance of counsel may reach him by means of deception and trickery.” (People v Townsend, 33 NY2d 37, 41.)
Accordingly, defendant’s motion to suppress his statements is denied.
So Ordered.