■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANKIE WOODARD, Appellant.—Judgment, Supreme Court, Bronx County, rendered September 9, 1974, upon a jury verdict convicting defendant of two counts of rape in the first degree, one count of sodomy in the first degree, three counts of robbery in the first degree and possession of a dangerous instrument as a misdemeanor, and sentencing him to concurrent terms of 8⅓ to 25 years on the felony counts and one year on the misdemeanor count, reversed, on the law, defendant's motion to suppress granted and the matter is remanded for a new trial. Defendant was arrested and charged with rape and sodomy on the afternoon of March 23, 1974. That night while in Criminal Court and before defendant's arraignment an Assistant District Attorney interviewed him and advised him of his right to counsel as follows: "Q. Third of all, you have a right to have a lawyer present if you wish to. Do you understand that as well? A. I can't afford a lawyer. Q. If you can't afford a lawyer, one can be provided for you free of charge, by the Court. Okay? A. Yeah. Q. Knowing all these rights and understanding them, do you want to talk to me about what happened that night or sometime back in March? A. May I have Legal Aid? Q. You have a right to have a lawyer present, but I'm just asking you whether or not you wish to waive that right and speak to me. You have a right to waive that right if you wish. A. I'll speak to you. Q. So, you will waive those rights? A. Yes. Q. And you understand them? A. Yes. Q. On March 5, 1974, do you recall where you were? A. Yes. Q. Tell me basically what happened, in your own words?" Defendant thereupon made

an inculpatory statement, after which the following colloquy ensued: "Q. Thank you, Mr. Woodard. I have nothing else to ask you. Do you have anything to ask me? A. Yeah, will I be able to see a lawyer? Q. Yes, you will be able to see your lawyer in Court, but as you indicated, you waived. A. Yes, I know I just wanted to know. Q. Sure, you will be able to see a lawyer; but as far as speaking to me now, you realize you waived your right? A. Yes." Defendant was thereafter represented by counsel who unsuccessfully moved to suppress the statement, which was received in evidence at the trial as part of the People's case. Beyond question a defendant who has not yet retained counsel may waive his right thereto in the course of prearraignment interrogation. However, the People have a heavy burden when they attempt to prove a defendant has voluntarily and intelligently waived that right. (Miranda v Arizona, 384 US 436, 475; People v Ramos, 40 NY2d 610, 618.) That burden was not carried here. Defendant's request for "legal aid" was clear and categoric. It having been made, at that point the interrogation should have ceased (see People v Buxton, 44 NY2d 33) and he should not have been importuned to "waive" it. His statement should have been suppressed even if his request for an attorney be considered an ambiguous one, as the People urge, for whatever ambiguity was created existed because of the prosecutor's failure to clearly and effectively explain to defendant, who had but a ninth grade education, what the right to counsel consisted of. And if the prosecutor was in doubt as to whether defendant had indeed relinquished his right to counsel it was incumbent upon him not to play fast and loose with that precious right but rather to insure it was protected. (Cf. People v Ramos, supra, p 618.) The circumstances here, namely the lack of clarity in the warning, the defendant's express request for a lawyer both before and immediately after the statement was given, the prosecutorial atmosphere, the repeated reminder that he could forego his right to have a lawyer, the defendant's degree of literacy and the credible claim that he did not understand what "waive" meant, belie the assertion that he understandingly rejected the offer of counsel. (People v Lockwood, 44 NY2d 769, revg 55 AD2d 17, on dissenting opn of Capozzoli, J.; People v Coleman, 43 NY2d 222, 227.) The other arguments adopted by defendant, particularly that of prosecutorial misconduct during the course of the trial and the probable effect which the admission of the statement had on defendant's trial strategy, without more, would not justify a reversal for there is ample evidence to support the conviction. Nevertheless a new trial should be had for the disregard of the defendant's right to counsel here is a sufficiently egregious error to require it. Concur—Murphy, P. J., Fein, Markewich and Yesawich, JJ.; Lupiano, J., dissents in the following memorandum: "It is fundamental and a well-established constitutional principle that if a defendant expresses a desire to speak with a lawyer, the police are prohibited from any further interrogation of him until he has been given that opportunity (Miranda v Arizona, 384 US 436, 474; see People v Gary, 31 NY2d 68). It is equally well settled however that '[a]ny statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. * * * There is no requirement that police stop a person who * * * states that he wishes to confess to a crime * * * Volunteered statements of any kind are not barred by the Fifth Amendment' (Miranda v Arizona, supra, at p 478; see People v Kaye, 25 NY2d 139; People v McKie, 25 NY2d 19)" (People v Jackson, 41 NY2d 146, 151). Defendant charged with two counts of rape in the first degree, three counts of robbery in the first degree, two counts of sodomy in the first degree, two counts of sexual abuse in the first degree and possession of a

weapon, dangerous instrument and appliance as a misdemeanor, was convicted, after a jury trial, of the two counts of rape, one count of sodomy, the three counts of robbery and the one count of sodomy, the three counts of robbery and the one count of possession. In effect, defendant was found not guilty of only one count of sodomy. The crimes were particularly vicious and characterized by a singular lack of humanness or dignity. At trial the proof of guilt was overwhelming. Before embarking on a legal analysis of the issues raised by defendant on appeal, I acknowledge a perception of law as founded on reason and common sense, having as its goal the dispensation of justice based upon the ascertainment of truth. In striving to apprehend the truth, the law, realizing the limitations of human nature and concerned with the practical application of abstract reasoning in the "real" world, has of necessity evolved a complex and interlocking mosaic of rules and principles, both procedural and substantive. The nature and relative viability of these rules and principles, viewed singly or in conjunction with each other, have as their ultimate end, not the frustration of truth and the impairment of freedom, but the realization of truth and the enjoyment of freedom. Indeed, "The truth shall make you free" (St. John 8:32). Nevertheless, the means to an end may occasionally assume the aspect of an end in itself. Thus, the rules and principles of the law may sometimes be viewed as an end in itself, without any relevance to the discernment of truth. In this context, a criminal trial and appeal may, on occasion, be tortured by participants into an arena of combative gamesmanship, with the ultimate prize being a "win" or a "loss", rather than the meting out of justice grounded in truth. This is a result to be avoided. With full assurance that the spirit of the law is served when truth is served, and recognizing that reason and common sense are sure guides, the issues raised on this appeal are now considered. At about 9:50 P.M., on March 23, 1974, as he waited to be arraigned, defendant was interviewed by an Assistant District Attorney who advised defendant of his rights, as follows: "Q. Third of all, you have a right to have a lawyer present if you wish to. Do you understand that as well? A. I can't afford a lawyer. Q. If you can't afford a lawyer, one can be provided for you free of charge, by the Court. Okay? A. Yeah. Q. Knowing all these rights and understanding them, do you want to talk to me about what happened that night or sometime back in March? A. May I have Legal Aid? Q. You have a right to have a lawyer present, but I'm just asking you whether or not you wish to waive that right and speak to me. You have a right to waive that right if you wish. A. I'll speak to you. Q. So, you will waive those rights? A. Yes. Q. And you understand them? A. Yes. Q. On March 5, 1974, do you recall where you were? A. Yes. Q. Tell me basically what happened, in your own words?" At the end of the interrogation the following exchange occurred: "Q. Thank you, Mr. Woodard. I have nothing else to ask you. Do you have anything to ask me? A. Yeah, will I be able to see a lawyer? Q. Yes, you will be able to see your lawyer in Court, but as you indicated, you waived. A. Yes, I know. I just wanted to know. Q. Sure, you will be able to see a lawyer; but as far as speaking to me now, you realized you waived your right? A. Yes." During the course of the *Huntley* hearing held to determine the admissibility of defendant's statement at trial, the Assistant District Attorney who conducted this interrogation testified as follows: "I wanted to know from Mr. Woodard whether or not he wanted to have a lawyer present at this time during our conversation, and that was the thrust of my next question when I informed him that 'You have a right to have a lawyer present,' meaning at this time, and I said— 'but I'm just asking you whether or not you wish to waive that right to have

a lawyer and speak to me. You have the right to have an attorney present if you wish,' and then he responded 'I'll speak to you,' and then I wanted to go one step further again, trying—and bring forward to Mr. Woodard, to protect those rights, I said 'So you'll waive those rights?' and his answer was yes * * * If someone I'm speaking to, who is in custody, says that 'I want a lawyer before I speak to you,' I don't go any further * * * I wanted to know if he wanted Legal Aid now * * * I had one idea at this time, if the man wants to speak to me, and I have to advise him whether—if he wants a lawyer present at this time. If he tells me he wants a lawyer present during the conversation, I would not go any further. Mr. Woodard didn't tell me that." The court at the conclusion of the *Huntley* hearing denied defendant's motion to suppress his statement with the observation that "The thrust of the defendant's argument in this motion is that the mere intoning of the words as set forth in *Miranda v. Arizona* decision are not sufficient and that accordingly the defendant's rights were violated. The Court * * * finds that the defendant's constitutional rights were not violated in that Miranda warnings were given to that defendant and intelligent waiver was made by the defendant." On the issue of the admissibility of defendant's statements, it is clear that the statements were not made after defendant unequivocally indicated a desire for an attorney. The Assistant District Attorney gave the requisite *Miranda* warnings. (Defendant, prior thereto, had received the warnings from the police.) He advised defendant that he had a right to have a lawyer present. Defendant responded that he could not afford a lawyer. The Assistant District Attorney replied—one will be provided by the court, free of charge. Defendant acknowledged this advice. The Assistant District Attorney then inquired whether defendant wished to speak to him about the incident. Defendant did not respond to this inquiry with an answer, but, rather, with the inquiry: "May I have Legal Aid?" This response created an ambiguity as to whether it related to the prior advice given as to the right to counsel, albeit free of charge, or whether defendant was indicating a desire not to speak without counsel present. Accordingly, the Assistant District Attorney did not proceed to interrogate defendant, but inquired as to the state of defendant's mind, *i.e.*, the Assistant District Attorney stated—"You have a right to have a lawyer present, but I'm just asking you whether or not you wish to waive that right and speak to me. You have a right to waive that right if you wish." Defendant unequivocally responded, without hesitation, "I'll speak to you." We should not abandon common sense. There was no unambiguous, unequivocal request for counsel, but there was an unambiguous, unequivocal acknowledgment by defendant that he wished to speak to the Assistant District Attorney. There is no demonstration on this record of a continuing interrogation aimed at persuading defendant, by repetitive questioning, to waive the presence of counsel after defendant expressed, in any manner, an unequivocal request for counsel. To hold otherwise is to decree, in effect, a prohibition against the waiver of the right and to render illusory the prospect of voluntary statements or confessions. Of course, defendant's statement was not a confession, but an exculpatory narrative. However, it did contain—no doubt because of practical necessity—certain admissions which were of an inculpatory nature. The statement was given prior to arraignment and did not delay or otherwise interfere with the arraignment process. Apparently defendant was in the courthouse awaiting arraignment when the interrogation occurred. In *People v Rodriguez* (11 NY2d 279, 284) the Court of Appeals declared: "as we recently held in *People v. Meyer* (11 N Y 2d 162), it matters not that the defendant gave his statement before indictment. It is

the interrogation, in the absence of counsel, after the criminal proceeding has been commenced, whether by grand jury indictment or by a charge placed before a magistrate following an arrest, which is forbidden." (See, also, *People v Hobson,* 39 NY2d 479; *People v Richardson,* 25 AD2d 221, 223-224.) Assuming the statement of defendant was made prior to arraignment, but in the courthouse with the arraignment imminent, the judicial process may be deemed to have, in effect, begun. While defendant was apparently arraigned in the evening of March 23, 1974, the indictment charging defendant with these crimes was filed on March 28, 1974. In *People v Lopez* (28 NY2d 23, 25, cert den 404 US 840), the Court of Appeals noted that "these cases upholding the rule that after indictment a defendant may not be questioned without counsel do not decide the question whether the right may be knowingly and intelligently waived. Nor does *People v. Miles* (23 N Y 2d 527) decide the question, for there defendant had been indicted, arraigned, and had counsel, and the holding was that waiver not in the presence of such counsel would not be recognized. The principle laid down in *People v Bodie* (16 N Y 2d 275) seems controlling here. There the criminal prosecution had been instituted by the filing of an information and the issuance of a warrant. The court's opinion noted that 'no valid distinction can be made between a postindictment and a postinformation statement' (p. 279). The holding was that the right to counsel could be, and there was, waived. The waiver there deemed sufficient was oral (p. 278)." To reiterate, the interrogation at which defendant waived the right to counsel occurred prior to, albeit on the eve of arraignment. Admittedly, "Whether the right to counsel *after* arraignment may be waived by a defendant in police custody in the absence of counsel * * * is a question which has not been met with any uniform response (compare, e.g., *People v. Vella,* 21 N Y 2d 249, 251; *United States v. Wade,* 388 U. S. 218, 237, with *People v. Lopez,* 28 N Y 2d 23, 25-26, cert. den. 404 U. S. 840)" *(People v Sugden,* 35 NY2d 453, 461). (Emphasis supplied.) Mindful of the importance and complexity of such issues, it is mandatory that their resolution be based on their intrinsic merit when limned against the search for truth, and not on the accidental predilections of those whom society vests with the responsibility to so resolve. Defendant's constitutional rights have not been violated, and it does not appear that defendant is deficient with respect to advancing or protecting his self-interest. However, assuming the defendant's statement is inadmissible, either because it occurred in the absence of counsel or because it occurred after defendant requested counsel, the admission of such statement at the trial was harmless error. The statement given by defendant to the Assistant District Attorney is as follows: Defendant, while out on a pass from the Harlem Drug Program, proceeded from Manhattan to The Bronx to see his mother. On his way he stopped at a building in The Bronx on Costa Street to see if a girl named Pauline was home. After knocking on an apartment door, defendant was confronted by a girl who was a stranger to him and who, in response to his inquiry, declared that Pauline doesn't live there. Two other women were present in the apartment. Defendant entered the apartment and reiterated his desire to see Pauline. Acknowledging that Pauline wasn't there, defendant turned to go, when he asked one of the girls her name. They engaged in conversation in the kitchen, where defendant stroked the young lady on her breast and was immediately slapped. Defendant slapped her back and upon the mother, who was with the other girl in another room, asking "what's going on in there", defendant left the apartment. Defendant denied having sex with any of these three women or molesting or threatening them in any fashion. It was acknowledged by

defendant at the time he gave this statement that he was cognizant of the complaint the three women had placed against him. Although the statement was exculpatory in nature and was not a confession, the admission by defendant that he was in the apartment with the three women and had touched the breast of one of them may be viewed as inculpatory, that is, it tended to substantiate the story of the women that defendant was in the apartment with them. The People's case at trial consisted of testimony of the victims, a witness Willy James and at the conclusion, the defendant's statement. The victims, all women, testified as follows: At the time of the incident, the apartment was occupied by Mrs. King, her niece, Cynthia, and one, Cheryl, the mother of a child fathered by Mrs. King's son. The apartment door was usually left unlocked by Mrs. King due to her difficulty in walking. Defendant entered the apartment unannounced and inquired for someone named Paula. After being informed that there was no such person living there, defendant left, but returned moments later asking to speak to Cheryl. In an effort to appease defendant and to persuade him to leave, Mrs. King told Cheryl to talk to defendant. Cheryl went to the kitchen to see what defendant wanted. He told her he liked her and asked her to leave with him. She told defendant to get out of the apartment and as she attempted to depart from the kitchen, defendant grabbed a knife and in the ensuing struggle cut Cheryl on her chin and two fingers. Defendant forced Cheryl into the living room and proceeded to terrorize the three women with the knife and his physical strength. After forcing the women to partially disrobe, and after committing his acts of robbery, defendant proceeded to enjoy an orgy of repetitive rape and sodomy with each of the two younger women. These crimes were witnessed by each of the other two women who happened not to be the immediate object of defendant's bestial attention and desires. Defendant was heedless to the pleas for mercy coupled, in the case of one of the young women, with the disclosure that she was pregnant. During the course of these abominations, defendant was interrupted by a rapping at the apartment door which had been secured by a chain. Mrs. King's friend, Willy James, who had a key to the apartment, was surprised to find that the door was secured with the chain lock and was trying to gain access to the apartment. Ultimately succeeding in unlocking the chain, Mr. James found defendant putting on his clothes and the partially dressed women. By this time, Mrs. King had freed herself from her bonds. The women having been thereafter threatened by defendant, maintained silence until defendant left moments later. When defendant left, they immediately began to scream and relate the sordid story of defendant's criminal caprices. Mr. James was berated by Mrs. King for doing nothing. The police and Cynthia's husband were notified. Upon arrival a short time later, the police found the women in a state of hysteria. Medical testimony disclosed that Cheryl had a cut on her chin and fingers and signs of physical sexual abuse. Faced with the testimony of the three women, each of whom saw defendant for an extended period of time at a close distance and each of whom related her observation of the acts committed by defendant on the others as well as the depravations practiced by defendant on the witness and confronted by the testimony of Mr. James, the cumulative effect of which was patently overwhelming, defendant took the stand and gave his version of the events of March 5, 1974. This move was dictated by the overwhelming nature of the People's case which existed separate and distinct from the disclosure of defendant's statement. To reiterate, Mr. James confirmed the fact that defendant was in the bedroom with the women and that they were undressed. The medical testimony corroborated

the fact that Cheryl had been cut and that there was sperm in her vagina. Testimony elicited from the People's witnesses was consistent on virtually every detail and was fully supported by the circumstantial evidence. No demonstration was made or attempted with a view toward establishing a motive to lie on the part of these witnesses. Defendant's version of the events, at trial, may be briefly summarized. He left the Harlem Drug Treatment Center where he was being treated for drug addiction and imbibed alcoholic beverages with some friends. Arriving in The Bronx by cab to visit his mother, defendant stopped at the home of a female acquaintance and "propositioned" her. When she rebuffed defendant's offer of a sexual encounter, defendant went to the premises where he alleged an old girl friend named Pauline lived. He knocked on the door and observing three women inside asked to see Pauline. After being told that no such person lived there, he was invited in by Mrs. King, the oldest of the three women. He again inquired about Pauline and Mrs. King responded that defendant knew that Pauline didn't live there. Mrs. King inquired if defendant had come to see her daughters. Defendant answered no, but declared that Mrs. King's two daughters were lovely. According to defendant he was about to leave the premises when he asked to speak to one of the two younger girls, Cheryl. He followed her into the kitchen and "propositioned" her to engage in sexual activity for a fee. After engaging in sexual congress on the kitchen chair, defendant refused to pay on the ground that the service was not worth the price. The young lady slapped him and he slapped her back and walked out of the apartment. Defendant denied ever having a knife, ever being in the bedroom, ever seeing Willy James and ever engaging in any acts of robbery, forcible intercourse or sodomy. Defendant admitted that this young lady was a stranger to him and that he had no reason to believe she was a prostitute. Comparison of defendant's trial testimony with his pretrial statement discloses the unusual circumstance that, when viewed from the inculpatory aspect, the trial testimony is much more inculpatory than the pretrial statement. In the trial testimony, defendant admitted to engaging in sex with one of the women. Study of the trial transcript convincingly demonstrates that the consistency and unimpeached character of the testimony of the People's witnesses, viewed in cumulative totality, warranted the realistic decision by defendant to testify. While defendant's pretrial statement denying criminal activity placed defendant at the crime scene, this fact was already testified to by four witnesses. There was no admission in the pretrial statement of sexual intercourse with any of the women, yet defendant at trial freely admitted such act, albeit that it was consensual. The decision to testify and to freely give testimony of an inculpatory dimension far exceeding the pretrial statement was not dictated on this record by the admission of the pretrial statement, at the conclusion of the People's case (see *People v Sugden,* 35 NY2d 453, *supra).* In summary, the admission of the pretrial statement was not constitutional error, and assuming it to be such, it was harmless. As noted in *People v Almestica* (42 NY2d 222, 224-226) by Chief Judge Breitel: "Even constitutional error may be harmless when, as in this case, it is clear, beyond a reasonable doubt, that the error did not contribute to defendants' conviction *(Chapman v California,* 386 US 18, 23-24) * * * that is, if there is no reasonable possibility that the erroneously admitted evidence contributed to the conviction". Consideration is now given to defendant's complaints of prosecutorial misconduct and the cumulative effect of trial errors. The People admit that it was error for them to inquire of defendant whether he had attempted to locate "Pauline", the girl friend in search of whom he

claimed to have entered the victims' building. However, of the three inquiries made by the People, defendant's objections to two were sustained and the inquiries concerned an issue distant from the essential issues involving defendant's guilt or innocence. No such suggestion was made in summation and the trial court in its instructions to the jury was quite clear as to who had the burden of proof.* As for the People's questions of Dr. Ghosh concerning whether a vaginal abrasion observed by him in his examination of one of the victims was evidence of forceful intercourse, defendant's objections were sustained and the witness virtually stated that a vaginal abrasion, as an indicator of forceful intercourse, was unreliable. The People also committed error in cross-examining defendant when in violation of the trial court's directions, they attempted to characterize defendant's testimony as lies. However, the totality of this claimed misconduct by the People and of claimed erroneous rulings by the trial court is insufficient to demonstrate either that defendant was deprived of a fair trial or that there is a probability that the jury's judgment was infused with reasonable doubt. Regarding nonconstitutional error, the rule is that "error is prejudicial * * * if the appellate court concludes that there is a significant probability, rather than only a rational possibility, in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred" (People v Crimmins, 36 NY2d 230, 242). On this record and under the circumstances of this case, there is no significant probability in light of the overwhelming proof of guilt, that had it not been for the errors which occurred, the jury would have acquitted the defendant. Defendant contends that the sodomy count of the indictment is jurisdictionally defective because it fails to describe the exact factual basis of the crime. The contention is without merit. We have held that sodomy generally charged in statutory language without description of the specific nature of the deviant act is jurisdictionally well pleaded (People v Gay, 63 AD2d 590; contra: People v Jackson, 60 AD2d 893). Defendant's plaint that his sentence is excessive is on this record totally devoid of merit. Finally, if defendant's version of the incident was to be found credible by the jury as finders of the facts, they must also find the People's witnesses, to wit, the three women and Willy James, to be not credible. In essence, the jury would have to conclude that because defendant reneged on a promised financial gratuity for a single act of sexual intercourse with one of the women, the three women conspired together with Willy James to frame defendant by fabricating an involved factual story of robbery and an orgy of *repeated* rapes and sodomy with consequent complaint to law enforcement officials and the commission of perjury during the judicial process. There is nothing in the record relating to the character or ability of these victims which tends to show them capable of such an involved endeavor. Common sense impels recognition of the law of probability as it relates to human nature and conduct. Social scientists and behaviorists, the statistical reports of criminal enforcement agencies and those responsible for administration of the criminal justice system demonstrate in unequivocal terms that rape and sodomy are among the least reported crimes by the female victims. The psychological dimensions as well as the physical realities of this species of crime cannot and must not be ignored. Awareness of these truths and study of the printed words of the trial transcript lead to the inescapable conclusion that justice did not miscarry in the instant matter. Accordingly, the judgment of

---

* The People's questions to defendant on cross-examination respecting Martha Davis and Annette Hardman are viewed in a similar light.

the Supreme Court, Bronx County, rendered September 9, 1974, upon a jury verdict, convicting defendant of, *inter alia,* rape in the first degree, should be affirmed.

