OPINION OF THE COURT
Eugene W. Bergin, J.
The defendant, having been indicted by the Monroe County Grand Jury on July 25, 1979 and charged with the crime of murder in the second degree, now moves this court for an order pursuant to CPL 710.20 (subd 3) suppressing from use at trial certain statements made to the officials of the State of Utah during the months of January and February, 1979, while the defendant was in that State.
The indictment alleges that the defendant at Rochester, New York, between June 9, 1976 and June 28, 1976 caused the death of Mary C. Robinson.
A hearing was held in this matter on October 29, 30, 31 and November 1, 1979 at which time testimony was taken from Mr. Terry Jensen, a psychiatric social worker employed by the Utah State Hospital of Provo, Utah, and Ms. Betty Davies a probation officer of the State of Utah. The defendant’s wife also testified at the hearing. Counsel have also submitted a stipulation of facts dated October 3, 1979. This court therefore based on the testimony received at the hearing and the stipulation entered into by the District Attorney and the attorney for the defendant, makes the following findings of fact.
The defendant was arrested for aggravated assault on October 16, 1978 in the City of Provo, Utah, as a result of an incident occurring on the Brigham Young University campus involving an assault upon a young woman. The defendant appeared in the Utah County District Court and was assigned *21 counsel. He pleaded guilty to the charge. On December 8, 1978 the District Court Judge remanded the defendant to custody and ordered a 90-day evaluation for the purpose of sentencing which was scheduled for March 9, 1979.
The court finds as a fact that the defendant has been in a state of custody since December 8, 1978.
The defendant was admitted to the Utah State Hospital on January 30, 1979 and was seen by Mr. Jensen on January 31, 1979. The purpose for Mr. Jensen seeing the defendant on that day was to obtain a social history for inclusion in the report to the court. The defendant related his general social history covering his family and other involvements with the legal system since his childhood. The defendant related that there was another crime that he was concerned about that he wanted to get cleared up, and left the impression with Mr. Jensen that he had committed a rape-murder. He asked Mr. Jensen as to what degree of confidentiality there would be if he were to relate any specific facts. Mr. Jensen told him that there was no complete confidentiality. The defendant wanted Mr. Jensen to check further. Jensen talked with his supervisor who consulted with the Assistant Attorney-General of the State. On February 1, 1979, Jensen passed the information back to the defendant that on a capital offense there would definitely be no confidentiality. The defendant told Jensen that he wanted to get his life straightened out and that he would want to talk to his wife.
The next day, February 2, 1979, the defendant’s wife visited him in the presence of Mr. Jensen. There were no specifics mentioned but at the conclusion of the conversation the defendant requested that Mr. Jensen contact the Adult Probation and Parole to set up an appointment to discuss this, so far, unspecified time.
At this point the defendant was not encouraged or requested to divulge this unspecified crime, he was not told that he would be accepted into any treatment program if he revealed this incident, nor was he told that he would be rejected from a program if he failed to reveal the matter. He was not questioned on the matter by Mr. Jensen. However the defendant was told by Mr. Jensen that if the defendant himself did not report the matter to the Adult Probation and Parole that he, Jensen, would report what little he knew of the matter to them.
Complying with the defendant’s request, on February 7, *22 1979, Betty Davies, a probation officer for the State of Utah, visited the defendant in the presence of Mr. Jensen. The defendant asked to speak to Ms. Davies alone. He spoke with her for about one hour telling her about his background, his father and his mother and that he had been involved in Satan worship. After a time the defendant went to use the restroom and they then went to another office as the office they were using was needed by other people. The defendant then told her that he was going to tell her what he was talking about. Ms. Davies asked the defendant if Mr. Jensen could rejoin them before he did that. Mr. Jensen was asked back to the room. Mr. Jensen asked the defendant if he was sure that this is what he wanted to do. The defendant replied that it was and for the first time to the Utah officials the defendant stated that he had murdered a woman. He paused and asked what else do you need? Ms. Davies told the defendant that we need a name, date and place and the defendant took a yellow pad of paper and wrote the name Mary Robinson and a date and 77 Brooks Avenue, Rochester, New York. The defendant then proceeded verbally to give further details of the crime.
The defendant was told that the information would be given to the New York authorities and the interview was terminated.
The defendant in his interview with Mr. Jensen and Ms. Davies was not given any Miranda warnings. The following day the defendant was taken into police custody and advised of his Miranda rights. He refused to discuss the murder with the police and he was transferred to the Utah County Jail. The defendant was returned to Rochester, New York, and arraigned on this indictment on August 22, 1979.
The court finds as a fact that there was no physical abuse of the defendant at any time during his interviews with Mr. Jensen or Ms. Davies.
The court finds that the Utah officials were not investigating the death of Mary Robinson nor were they in contact with the New York State authorities prior to February 7, 1979.
The court finds that neither Mr. Terry Jensen nor Ms. Betty Davies knew of the death of Mary Robinson prior to the defendant’s statements on February 7, 1979, nor did they initiate any questioning concerning her homicide. The defendant was never asked to reveal any uncharged crimes. He was not told to be open, honest and candid in order to gain entry into a treatment program. The defendant initiated all discus *23 sions with Mr. Jensen and Ms. Davies concerning his involvement in the homicide.
PRIVILEGE
The defense contends that all conversations between Mr. Terry Jensen and the defendant were privileged communications and the defense asks the court to declare that under the circumstances of this case the conversations between Ms. Betty Davies and the defendant were also privileged.
There was no common-law privilege existing to protect communications between patient and physician. This privilege is described by statute in CPLR 4504. It cannot be strongly contended that this privilege would apply. Indeed there are no facts which would indicate that the defendant was a patient of Mr. Jensen.
Although Mr. Jensen was an employee of a medical corporation and as such the relationship of a physician and patient could exist between them, the court finds as a fact that this relationship did not exist. The mere fact that the interview was conducted in a hospital does not give rise to the privilege. The defendant was at the Utah State Hospital on a court-ordered evaluation. The information claimed to be privileged must be necessary for treatment. Here no treatment was anticipated or possible under the court-ordered evaluation.
It is however urged that CPLR 4508 would prevent the disclosure of the defendant’s statements to Mr. Jensen who is a psychiatric social worker. That section provides that:
"A person duly registered as a certified social worker under the provisions of article one hundred fifty-four of the education law shall not be required to disclose a communication made by his client to him * * * except
"1. that a certified social worker may disclose such information as the client may authorize;
"2. that a certified social worker shall not be required to treat as confidential a communication by a client which reveals the contemplation of a crime or harmful act”.
There is no evidence on the record that Mr. Jensen was a duly registered certified social worker. To meet this definition a person has to conform to the requirements of article 154 of the Education Law. Under the provisions of that article a certified social worker must be licensed and have filed an application with the New York State Education Department. *24 That Mr. Jensen did not do and therefore this statutory privilege would not apply.
Even assuming that the social worker privilege requirements had been technically met there are substantial reasons why this court should not apply the privilege. The reason for the establishment of the privilege did not contemplate that it would be a shield behind which the commission of a homicide would be sheltered. Statements made bearing adversly upon the health, safety and welfare of children have been held not to be privileged within the contemplation of this statute and are subject to compulsory disclosure. (Perry v Fiumane, 61 AD2d 512; People v Easter, 90 Misc 2d 748.)
There is no indication that the defendant was the client of Mr. Jensen. The mere circumstances that Mr. Jensen was a social worker and that he was interviewing the defendant does not in and of itself establish a client relationship. The defendant made disclosures during the initial interview. There was no advice given or program planned. The law has recognized that even in the husband-wife relationship not all communications are privileged, only "those which would not have been made but for the absolute confidence in and induced by the marital relationship.” (Perry v Melski, 10 NY2d 78, 80.)
The very direct statement by Mr. Jensen to the defendant on February 1, 1979 that after consultation with the Assistant Attorney-General of Utah there would be no confidentiality if the matter involved a capital offense must be given great weight. The defendant could have been under no misapprehension in regard to confidentiality. His statements made to Mr. Jensen and Ms. Davies, were made knowingly by him that no privilege would attach. This court therefore finds that the defendant, knowing that his statements would not be confidential, cannot now assert a claim of a privilege that never did exist.
MIRANDA RIGHTS
A challenge is made to the admissibility of the defendant’s statements to the social worker and the probation officer on the basis that the defendant was not advised pursuant to Miranda v Arizona (384 US 436).
A proper determination of this claim must include a reexamination of what the United States Supreme Court held in Miranda. "The principles announced today deal with the *25 protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody” (Miranda v Arizona, supra, p 477; emphasis added).
Miranda itself was concerned with the area of overbearing police conduct during interrogation. The court cited numerous examples of police brutality, torture and the less apparent but no less insidious use of psychological coercion. It looked to texts and manuals which described standard interrogation techniques and their widespread use by police agencies to note that the creation of such an environment is for no other purpose than to subjugate the will of the individual to that of the examiner. (Miranda v Arizona, supra, pp 445-456.)
It is with this background in proper perspective that an examination of the totality of circumstances in the instant case should point to the resolution of the challenged statements. Any attempt to precisely categorize the statements of the defendant in this case into utterances made to a probation or parole officer, statements made by a defendant represented by counsel concerning uncharged crimes, statements made to peace officers, police officers or public servants, does not lead to a satisfactory resolution of the question.
In People v Ronald W. (24 NY2d 732) the Court of Appeals of the State held that a probation officer under the facts of that case did not have to advise the defendant pursuant to Miranda. It has also been held in this State that a parole officer must advise a defendant when questioning him in jail concerning new charges (People v Ferguson, 90 Misc 2d 467). Conversely statements made to police officers have been held to be admissible without being Mirandized if the defendant initiated the conversation. (People v McKie, 25 NY2d 19.)
In McKie (supra) it was conceded that the police went looking for the defendant in order to question him, that they were previously cautioned by the defendant’s attorney not to question him, however the defendant was approached on many occasions by the police to engage him in an incriminating conversation, he being the prime suspect in a homicide. Finally the police were successful. They spoke with him on the street and argued with him and an officer stated " 'You seem to be so brave now; you weren’t so brave when you killed the little old lady’ ”. To that the defendant replied " T did it, but you guys can’t prove it’ ”. (People v McKie, supra, p 23.) The court held that "it was the defendant who initiated *26 the verbal duel, not the police. He simply could have walked away when he saw them, but instead he approached the car and started the conversation. It was the defendant who commenced the verbal attack upon Patrolman Monroe and it may be fairly said that the admission which resulted from the argument was the product of the defendant’s own bravado.” (People v McKie, supra, p 28.)
McKie has been placed in that category of cases described as having spontaneous statements. In People v Maerling (46 NY2d 289) it was pronounced that a confession may be admissible from a defendant in custody if his statements are genuinely spontaneous and not the result of inducement or provocation.
It is the opinion of this court that the so-called spontaneous exception is merely a description of an uncoercive atmosphere and a realization that the totality of the circumstances in a particular case may point to the fact that the admissions by a defendant were the product of his own initiation and not that of the police or public officials, be they probation or police or any other types of public servant.
As Chief Judge Cooke pointed out in People v Rogers (48 NY2d 167, 170), "The genesis of defendant’s utterance must be determined to be either as one arising out of sheer spontaneity or as having been induced by illegal police questioning.” Although Leonard Lipsky’s statements were not truly spur of the moment, spontaneous outbursts they may be treated similarly and the law that applies to spontaneous voluntary statements may be applied to this factual pattern. The genesis of Leonard Lipsky’s statements came from within him. They were not the result of any illegal police questioning. The defendant initiated the conversations concerning his involvement in the instant homicide.
This court must analyze the totality of the circumstances surrounding the admission of the defendant rather than attempt to categorize or place a label on a legal package.
Leonard Lipsky initiated the conversation with both Mr. Jensen and Ms. Davies concerning his involvement in the instant homicide. There was no questioning of the defendant until the defendant himself asked Ms. Davies what other information she would need. Questioning for the purpose of obtaining a clarification of the defendant’s version has been determined not to be interrogation. (People v Kaye, 25 NY2d *27 139.) "The only questions the detectives asked defendant during his narrative related to the times and dates of events which he had previously described.” (People v Kaye, supra, p 142.) Mr. Jensen and Ms. Davies were not acting as law enforcement officials. Mr. Jensen was following the mandate of the District Court to obtain a social history and include it in the report to the court. Ms. Davies who was a probation officer did not in her normal workday wear a uniform or carry a weapon, she did not do police work or conduct criminal investigations. Her responsibilities were to supervise probationers in various programs at the Utah State facilities and to write presentence reports. The defendant asked to see Ms. Davies rather than another probation officer. There was no force present or threat of force. Although the defendant was in a State facility from which he could not leave the building or the grounds, his custodial conditions did not in itself constitute a coercive atmosphere. He was not handcuffed. On February 7, 1979 when he was talking with Ms. Davies he could leave the room by himself to go to the bathroom. They were in sight of other people who needed the space in which the interview was being conducted and they in fact went to another office.
It is the conclusion of law that based on the facts found in this case there was no requirement of either the social worker or the probation officer to advise the defendant of his Miranda rights. The court finds the statement not to be the result of interrogation and to be a completely voluntary statement, made in a reflective and knowing manner after discussing the matter with his wife. This court attaches no significance to the fact that Mr. Jensen told the defendant on February 1, 1979 that he would report the matter to the probation and parole authorities if the defendant did not. Mr. Jensen had no facts at this point in time to report, he had no specific time of the possible crime, year or State. The defendant need not have gone any further but he chose to initiate further conversations with Ms. Davies.
Accordingly, the court holds the statements of the defendant to be voluntarily made and not obtained in violation of his constitutional rights and therefore may be introduced in evidence by the District Attorney in the trial of this indictment.