Harvey Lee HUNTER, Appellant,

v.

STATE of Alaska, Appellee.

No. 3557.

Supreme Court of Alaska.

Feb. 16, 1979.

---

Dana Fabe, Sue Ellen Tatter, Asst. Public Defenders, Brian Shortell, Public Defender, Anchorage, for appellant.

W. H. Hawley, Jr., Asst. Atty. Gen., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR, BURKE and MATTHEWS, Justices.

## OPINION

BOOCHEVER, Chief Justice.

Harvey Lee Hunter pleaded *nolo contendere* to two counts of larceny in a building, AS 11.20.150[1] and was sentenced to two consecutive three and one-half year terms. His appeal challenges the admissibility of statements made to a polygraph examiner who had not read him *Miranda* warnings[2]

---

1. AS 11.20.150 provides:

 *Larceny in building or vessel.* A person who commits the crime of larceny in a dwelling house, banking house, office, store, shop, or warehouse, or in a ship, steamboat, or other vessel, or who breaks and enters in the night or daytime a church, courthouse, meeting house, town house, college, academy, or other building erected or used for public uses, and commits the crime of larceny in it, is punishable by imprisonment in the peniten-

 tiary for not less than one nor more than seven years.

2. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court required that prior to custodial interrogation: the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of

prior to the examination and alleges his sentence was improper. We affirm the conviction but remand for resentencing.

Early in November 1976, Investigator Thomas Shanks of the Anchorage Police Department began to suspect that Harvey Lee Hunter had been involved in an October 20, 1976 burglary. Items missing in that burglary included cameras, lenses and an electronic strobe light from the offices of Rem-Pak Studio, and a postage meter and scale from the Office of the Human Rights Commission. Both offices were located in Anchorage at 2457 Arctic Boulevard, where Hunter, then age 20, was employed as a janitor.

Shanks originally questioned Hunter about the burglary at Hunter's home on November 3, 1976 where he advised Hunter of his *Miranda* rights. Hunter executed a written waiver of his rights. At that point, Hunter denied any knowledge of the missing goods.

The next contact was at the police station on November 8, 1976, and Hunter again signed a written waiver of his *Miranda* rights and again denied any involvement in the burglary. At that interview, Shanks requested that Hunter take a polygraph exam. The officer testified that:

[O]ur normal procedure is simply to request that they submit to it if there's any question of their involvement in a case that might be under investigation, and

then simply advise them that they have the right not to take the polygraph if they so desire . . . .

However, he did not specifically remember telling Hunter this information on November 8, 1976. Hunter testified that no one told him that the rights read to him at that meeting applied to polygraphs.

Hunter appeared at the police station on November 15, 1976, the day on which the polygraph had been scheduled. He testified that he had appeared to take the test because Shanks told him on November 8 "that I would have to take the test." He also explained that:

I went down there because the man told me to come down there. He'd wrote me out a appointment date and I had missed one and they came to my house the second time so it—and he came again. You know, I was tired of— . . . .

On cross-examination, Hunter was asked how the police made him believe he had to take the test. After admitting the officers didn't say anything bad would happen to him if he didn't take the test, Hunter stated it was the visits of the police officers to his house and their requests about the test that made him take the test:

I know I was tired of the police coming to my house or whatever, calling me, asking me to do things, and I didn't want to be hassled so I say, well, I'll go ahead and take it, I might could beat it.[3]

---

these rights, provided the waiver is made voluntarily, knowingly and intelligently. 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07.

3. The full interchange was as follows:

Q Okay. And is it your testimony that you felt that you had to take this examination?
A Yes, sir.
Q What did they tell you would happen if you didn't take it?
A They didn't say anything.
Q Did anybody, at any time, say that if you don't take this examination we're going to put you in jail?
A No.
Q Did they say, if you don't take this examination we're going to charge you with this crime?
A No, they didn't.

. . . . .

Q Well, why did you take this?
A Because he made me believe that I had to take it.
Q Tell the judge how it is that he made you believe that. What did he say?
A He kept com. . . .
Q What did he do?
A He kept coming and asking me about— calling me, came to my house several times.
Q How many times did he come to your house?
A Two I believe.

. . . . .

Q Why do you feel that you had to take this examination?
A Because the officer—Investigator Shanks gave—asked me to take it several times.
Q Several times?
A Yes, And I was . . . ..

On November 15, 1978, the day the test was administered, Hunter had a brief conversation with Shanks before being taken to the polygraph examination room. The polygraph examiner, Delbert W. Smith of the Anchorage Police Department, testified that he and Hunter had a short interview before the examination and that:

I . . . told him sometime during this interview that he was not required to take the polygraph examination, which is my standard procedure, so that nobody is told by our office or anybody else that they must subject themselves to a polygraph . . . .

He could not independently recall having told Hunter that he did not have to take the test or that he was free to leave, but said these statements were part of his normal procedure. Hunter did sign a release form indicating that he was requesting "voluntarily, without durress [sic], coercion, threats, promises of reward or immunity, to be examined by the Keeler Polygraph (lie detector) detection of deception technique." He was given no *Miranda* warnings on November 15, 1976 before the examination.

After the test was administered, a conversation occurred between Smith and Hunter. There is a conflict in the testimony as to the substance of the conversation. Smith recalls first telling Hunter that he was not "telling the truth." According to Smith, Hunter then agreed he was not telling the truth, and said he had thought he could "beat" the exam. Smith then asked Hunter if he wanted to "tell . . . the truth" to Investigator Shanks. Smith recalls that he did not question Hunter about the burglary at this point, but that nevertheless Hunter told him he could "get the cameras back." On cross-examination, he admitted that Hunter's statement "must have been in conjunction with a conversation." Hunter testified:

right after he took the—the thing—the polygraph off he said, I know you're guilt—guilty by the results of the test. You might as well confess, you know, and then he showed me the—where—where my lines was going all out of line.

Hunter's testimony was that right after Smith told him he had not been telling the truth, Smith questioned him about the burglary, as Smith was removing the polygraph equipment from Hunter: "he just asked me how did I do it." Hunter said, "Right after he unhooked me then I just told him that I did it." Then Investigator Smith "told me to go down there with him to confess to Investigator Shanks."

After the examination, Hunter was returned to the reception area. Smith told Shanks that Hunter had not told the truth "but apparently was prepared to now." After about five minutes, Shanks talked to Hunter, advised him of his rights under *Miranda* and took from him a statement admitting involvement in the burglary.[4]

Hunter was indicted for two counts of burglary not in a dwelling, AS 11.20.100. The motion to suppress the statements given "and the fruits thereof," on the claim of deficient notice of constitutional rights, was denied. Subsequently the indictment was dismissed and an information charging two

Q By several, you mean 2?

Q How many times?
A I don't remember exactly how many times. I know I was tired of the police coming to my house or whatever, calling me, asking me to do things, and I didn't want to be hassled so I say, well, I'll go ahead and take it, I might could beat it.
Q You might could beat it?
A Right. I had it in my mind. I was hoping that I would win, you see, 'cause he said if I beat it then they can't mess with me any more.
Q So you went down there hoping that you could beat the examination?

A Yes.
Q And by beating the examination, you mean that you were going to lie to Investigator Smith to see if you could trick him?
A Yes, sir.

4. Hunter admitted using one key to enter the two offices after his normal working hours, and said that he had already returned the postage meter and scale as well as four cameras and a strobe by putting them on the fire escape in two green army sacks. He also agreed to return the remaining merchandise by noon the next day.

counts of larceny in a building was filed. Hunter pleaded *nolo contendere* to the charge. The court sentenced Hunter to two consecutive three and one-half year terms and this appeal followed.

■ While a plea of *nolo contendere* is generally treated as a waiver of all non-jurisdictional defects,[5] we have established a procedure whereby a person so pleading may preserve a limited right to appeal. *Cooksey v. State*, 524 P.2d 1251, 1255–56 (Alaska 1974). The plea of *nolo contendere* first must be expressly conditioned upon the preservation of the limited right to appeal. *Id.* Secondly, the issue on appeal must be dispositive. *Oveson v. Municipality of Anchorage*, 574 P.2d 801, 803 n.4 (Alaska 1978).[6]

■ In the instant case, Hunter satisfied the first requirement by expressly reserving the issue for appeal at the time of his plea of no contest. We will not apply the second requirement, that the issue on appeal be dispositive of the case, since Hunter's plea was entered before this second requirement was fully explained in *Oveson v. Municipality of Anchorage, id.* Thus, Hunter's claim of error is properly raised to this court.

## I. ADMISSIBILITY OF HUNTER'S STATEMENTS

This case requires us to evaluate whether Harvey Hunter's post-polygraph statements were the product of custodial interrogation and therefore inadmissible because not preceded by *Miranda* warnings.[7] The trial court made two findings: that Hunter was not in custody when he took the lie detector test, thereby making *Miranda* warnings unnecessary; and if warnings were necessary, the warnings given by the police fulfilled the mandates of *Miranda*.[8]

The defense theory at the motion to suppress was that *Miranda* warnings were required when Hunter took the polygraph exam since, at that time, he was the focus of the burglary investigation. On appeal, the defendant no longer relies on the focus interpretation of *Miranda*, instead arguing alternatively that the administration of a lie detector made the interrogation custodial, that confrontation of the defendant with the results of the test made the interrogation custodial, and that, apart from *Miranda*, the statements were involuntary.

We reject the focus test for administration of *Miranda* warnings and adopt instead a reasonable person perspective for determining whether a person is in custody or otherwise significantly deprived of his freedom. We conclude that, on these facts, the defendant's statements were not the product of custodial interrogation and are therefore admissible, even if not immediately preceded by *Miranda* warnings. We also conclude Hunter's statements were voluntary. We do not need to consider the trial court's second finding that if *Miranda* warnings were necessary, the warnings given to Hunter sufficed.

## A. Standard for Custodial Interrogation:

In *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Supreme Court relied on the sixth amendment to exclude a confession because the police refused Escobedo's request for counsel made during interrogation; the interrogation occurred after the investigation had focused on the defendant. The case could be read narrowly or broadly, and a broad reading made focus of the investigation on

5. *See United States v. Grayson*, 416 F.2d 1073, 1077 (5th Cir. 1969), *cert. denied*, 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970); *McGrath v. United States*, 402 F.2d 466 (7th Cir. 1968).

6. In *Cooksey*, the issue on appeal was the trial court's interpretation of the four-month speedy trial provision of Criminal Rule 45. If Cooksey had prevailed, he would have been entitled to dismissal of the indictment. 524 P.2d at 1256.

*See Oveson v. Municipality of Anchorage*, 574 P.2d at 803 n.4.

7. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966).

8. It is unclear whether the trial court relied only on the previous *Miranda* warnings, given November 3 and 8, or also the waiver form Hunter signed before the polygraph test.

the defendant the touchstone for sixth amendment, right to counsel, protection.[9]

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966), held that the privilege against self-incrimination applied to informal police coercion as well as formal coercion[10] and required that a suspect be advised of his fifth and sixth amendment rights before "custodial interrogation:"

> By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The footnote to this definition of custodial interrogation states: "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." *Id.* at 444 n.4, 86 S.Ct. at 1612 n.4, 16 L.Ed.2d at 706 n.4.[11]

Some courts, familiar with the focus concept from *Escobedo*, required *Miranda* warnings because the investigation had fo-cused on the defendant, without requiring a separate finding of custody.[12] Most courts and scholars, however, early recognized that *Miranda* made custody, not focus, the test for advising suspects of their rights,[13] and as time passed, most courts rejected the focus test.[14] It was not until 1976, in *Beckwith v. United States*, that the Supreme Court expressly indicated that focus of the investigation on the defendant, with nothing more, did not require *Miranda* warnings.[15]

In *Peterson v. State*, 562 P.2d 1350, 1362 (Alaska 1977), we left as open whether " 'the principle of *Miranda* . . . should be extended to cover interrogation in noncustodial circumstances after a police investigation has focused on the [subject].' " We now hold that focus, per se, is not the proper test for *Miranda* warnings. Focus was and is still relevant, but it is relevant to a determination of custody.[16]

The shift from focus to custody still leaves the courts with the far from easy task of determining whether ques-

---

**9.** Graham, *What is "Custodial Interrogation?": California's Anticipatory Application of Miranda v. Arizona*, 14 U.C.L.A.L.Rev. 59, 63–64, 68 (1966).

**10.** 384 U.S. at 461, 86 S.Ct. at 1620, 16 L.Ed.2d at 716; McCormick on Evidence § 125 (2d ed. E. Cleary 1972).

**11.** One commentary referred to this as the "infamous 'obfuscating footnote.' " Smith, *The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?*, 25 S. Carolina L.Rev. 699, 707 (1974). The footnote was somewhat disingenuous because, as later cases clearly indicate, police can question a person who is the focus of an investigation while the person is not in custody or otherwise significantly deprived of his freedom. *See, e. g., Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (suspect in tax fraud investigation questioned at a private home where he occasionally stayed not in custody); *People v. McKies*, 25 N.Y.2d 19, 302 N.Y.S.2d 534, 250 N.E.2d 36 (1969) (no custody where defendant argued with police after police had followed him to a building).

**12.** Smith, 25 S. Carolina L.Rev. at 708–09.

**13.** *United States v. Hall*, 421 F.2d 540, 543 (2d Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970) (Friendly, J.); Graham, 14 U.C.L.A.L.Rev. at 59–63 (1966); Kami-sar, "Custodial Interrogation" within the Meaning of *Miranda*, in Criminal Law and the Constitution, 335, 339–40 (Reed et al. eds. 1968), *quoted in United States v. Hall*, 421 F.2d at 543 (emphasis the court's): "*Miranda's* use of 'custodial interrogation' actually markes a *fresh start* in describing the point at which the Constitutional protections begin."

**14.** Smith, 25 S. Carolina L.Rev. at 709. Most turned instead to an objective, reasonable person test for determining custody. *See* notes 19–21 *infra* and accompanying text.

**15.** 425 U.S. 341, 345–47, 96 S.Ct. 1612, 1615–16, 48 L.Ed.2d 1, 6–8 (1976). The decision of *People v. Reed*, 393 Mich. 342, 224 N.W.2d 867, 873–75, *cert. denied sub nom., Reed v. Michigan*, 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975), seems to have adopted focus as the test for *Miranda* warnings. The decision, though, is based on the federal constitution, and *Reed* was decided before the Supreme Court's express rejection of focus as the controlling factor for *Miranda* warnings.

**16.** *United States v. Hall*, 421 F.2d at 543; *State v. Kalai*, 537 P.2d 8, 11 (Hawaii 1975); *State v. Miller*, 565 P.2d 228, 232–33 (Kan.1977); *State v. Paz*, 31 Or.App. 851, 572 P.2d 1036, 1041 (1977) (en banc) (Schwab, C. J.).

tioning was initiated "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

United States v. Hall, 421 F.2d 540, 543-44 (2d Cir. 1969) (Friendly, J.), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). The determination of custody is "[p]robably the most difficult and frequently raised question" in the wake of Miranda. Kamisar, "Custodial Interrogation" within the Meaning of Miranda, in Criminal Law and the Constitution, 335 (Reed et al. eds. 1968).[17] Here, the Supreme Court has given little express guidance. The Court's four major post-Miranda decisions on custody, like many state decisions, basically re-

state the Miranda definition and find custody or not on the particular facts.[18]

Courts and commentators that have explicitly considered how to define custody have analyzed two approaches: a subjective test, whether this defendant thought he was in custody or whether the police officer thought the defendant was in custody; and an objective "reasonable person" test, whether a reasonable person would have thought he was in custody.[19] Most authority supports the objective, reasonable person test.[20] California's statement of this test in People v. Arnold, 66 Cal.2d 438, 58 Cal.Rptr. 115, 121, 426 P.2d 515, 521 (1967) (Tobriner, J.) is typical:

[C]ustody occurs if the suspect is physically deprived of his freedom of action in

**17.** Quoted in United States v. Hall, 421 F.2d at 543.

**18.** See Oregon v. Mathiason, 429 U.S. 492, 494-95, 97 S.Ct. 711, 712, 50 L.Ed.2d 714, 719 (1977) (per curiam) (parolee questioned at police station not in custody because he was free to leave); Beckwith v. United States, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1, 8 (1976) (suspect in tax fraud investigation questioned at a private home where he occasionally stayed was not in custody); Orozco v. Texas, 394 U.S. 324, 327, 89 S.Ct. 1095, 1097, 22 L.Ed.2d 311, 315 (1969) (suspect questioned in his bedroom was under arrest, not free to leave, and therefore in custody); Mathis v. United States, 391 U.S. 1, 4-5, 88 S.Ct. 1503, 1504-05, 20 L.Ed.2d 381, 385 (1968) (suspect questioned about tax fraud while imprisoned on another charge was in custody for Miranda purposes); Seagroves v. State, 282 Ala. 354, 211 So.2d 486 (1968) (juvenile defendant in custody, either for murder charge or, alternatively, for running away from home); Steigler v. Superior Court, 252 A.2d 300, 305 (Del.), cert. denied sub nom., Steigler v. Delaware, 395 U.S. 940, 89 S.Ct. 2012, 23 L.Ed.2d 457 and Steigler v. Superior Court, 396 U.S. 880, 90 S.Ct. 160, 24 L.Ed.2d 139 (1969) (defendant not in custody).

**19.** See, e. g., Lowe v. United States, 407 F.2d 1391, 1396-97 (9th Cir. 1969); State v. Paz, 572 P.2d at 1040-42; Smith, 25 S. Carolina L.Rev. at 707-14 (also analyzes the focus test). Professor Kamisar describes four approaches to determining custody:

(1) The subjective intention of the questioning officer to hold the person or to arrest him? (2) The degree to which the investigation has "focused" on the person, or, a variation of the same approach, whether or not

the police have 'probable cause' to arrest the person? (3) The subjective belief of the person that he is significantly deprived of his freedom? (4) The belief of the person, as a 'reasonable man' that his freedom is significantly impaired?

"Custodial Interrogation" within the meaning of Miranda, in Criminal Law and the Constitution 335, 362, quoted in 3 Wigmore on Evidence § 826(a) at 386 n.26 (Chadbourne rev. 1970).

**20.** State v. Paz, 572 P.2d at 1040-41; Smith, 25 S. Carolina L.Rev. at 712-13; 45 Fordham L.Rev. 1222, 1225-26 (1977). The following authority supports the objective, reasonable person approach. United States v. Bekowies, 432 F.2d 8, 12 (9th Cir. 1970) (adopting "the objective, reasonable man test"); United States v. Hall, 421 F.2d at 545; Lowe v. United States, 407 F.2d 1391, 1397 (9th Cir. 1969) ("The correct rule—an objective, reasonable man test"), People v. Arnold, 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967); People v. P., 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967); People v. Algien, 501 P.2d 468, 471 (Colo.1972) (en banc) (defendant would reasonably believe he was not free to leave); Commonwealth v. O'Shea, 456 Pa. 288, 318 A.2d 713 (1974); Myers v. State, 3 Md.App. 534, 240 A.2d 288, 290-91 (1968) (quoting the reasonable person test and concluding that the circumstances indicated the defendant was not free to leave and was therefore in custody); Kamisar, "Custodial Interrogation" within the Meaning of Miranda, in Criminal Law and the Constitution 335 (Reed et al. eds. 1968), cited in 3 Wigmore on Evidence § 826(a) at 386 n.26 (Chadbourne rev. 1970); Smith, 25 S. Carolina L.Rev. at 713-14 (supports reasonable person test as the basic standard, with focus as a possible additional test).

any significant way or is led to believe, as a reasonable person, that he is so deprived.

■ We agree that the objective, reasonable person perspective is the proper standard for determining custody. The custody determination must be made on a case-by-case basis, but the inquiry, as expressed by the court in *United States v. Hall*, 421 F.2d at 545, is whether:

> in the absence of actual arrest something . . . [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates [to the defendant] that they would not have heeded a request to depart or to allow the suspect to do so.[21]

This requires some actual indication of custody, such that a reasonable person would feel he was not free to leave and break off police questioning.

■ At least three groups of facts would be relevant to this determination.[22] The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.[23]

We believe a reasonable person test for custody is faithful to the basic concerns of *Miranda*. The Court required a standardized set of warnings to counteract the coercive effect of custodial interrogation on the person being questioned and to tell police officers how to protect a suspect's rights during such interrogation.[24] A reasonable person test for custody

> gives effect to the purpose of the *Miranda* rules; it is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does

---

**21.** The Ninth Circuit Court of Appeals has phrased the reasonable person test for custody:
Under it a suspect will be held in custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe he could not leave freely.
*United States v. Bekowies*, 432 F.2d at 12 (citation omitted). The Pennsylvania Supreme Court has stated:
the test for custodial interrogation . . . [is] "whether the suspect is physically deprived of his freedom of action in any significant way or is *placed in a situation in which he reasonably believes that his freedom of action of movement is restricted by such interrogation* . . . .".
*Commonwealth v. O'Shea*, 318 A.2d at 715 (emphasis in original, citation omitted).

**22.** The following analysis draws on the analysis in *State v. Paz*, 572 P.2d at 1041–42, of the "Factors to be Considered in the Objective Approach." The *Paz* decision lists three: whether the defendant could have left the scene of the interrogation voluntarily; whether the defendant was questioned as a suspect or a witness; and whether the defendant freely and voluntar-

ily accompanied the police to the place of questioning.

**23.** This factor cannot by itself be the determinative test for custody. The police might be willing to release a suspect after custodial interrogation, especially if the release permitted them to introduce statements that might otherwise be excluded for lack of *Miranda* warnings. Also, a court must determine whether the defendant was in custody when he made the incriminating statements; it is illogical to rest that judgment primarily on something that occurs after the defendant has made the statements.

**24.** *See* 384 U.S. at 448–58, 465–66, 86 S.Ct. at 1614–16, 1623, 16 L.Ed.2d at 708–14, 718–19. The Court stated: "Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact." 384 U.S. at 468–69, 86 S.Ct. at 1625, 16 L.Ed.2d at 720.

it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question. *People v. P.*, 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233, 233 N.E.2d 255, 260 (1967) (citation and footnote omitted).[25]

Some commentaries have interpreted *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam), as foreclosing, as far as federal constitutional guarantees go, the reasonable person standard for custody and adopting an "actual custody" or "custody in fact" standard.[26] We think this is a misinterpretation.

In *Mathiason*, a police officer suspected Carl Mathiason, a parolee, of involvement in a burglary and left a note asking Mathiason to call him. When Mathiason called, the officer asked where it would be convenient to meet. Mathiason had no preference, and the officer suggested the state patrol office. When Mathiason arrived, the officer told him he was not under arrest. They talked for five minutes in a closed room, and during their conversation, the officer said the police believed he was involved in the burglary and falsely stated that his fingerprints had been found at the scene. Mathiason sat for a minute or so and then said he had taken the property. After advising Mathiason of his *Miranda* rights and taking a taped confession, the officer told him he was not under arrest and Mathiason left. The officer said he was referring the case to the district attorney who would determine whether to bring charges.[27]

The Oregon Supreme Court had excluded the statements, finding they occurred in a "coercive environment." 549 P.2d at 675. The United States Supreme Court, without oral argument or full briefing by the parties, summarily reversed in a short per curiam opinion, finding on the facts before it:

> [T]here is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719.[28]

---

**25.** The court in *United States v. Hall*, 421 F.2d at 544, offered similar reasoning:

> The [Supreme] Court could scarcely have intended the issue whether the person being interrogated had "been taken into custody or otherwise deprived of his liberty in any significant way" to be decided by swearing contests in which officers would regularly maintain their lack of intention to assert power over a suspect save when the circumstances would make such a claim absurd, and defendants would assert with equal regularity that they considered themselves to be significantly deprived of their liberty the minute officers began to inquire of them. Moreover, any formulation making the need for *Miranda* warnings depend upon how each individual being questioned perceived his situation would require a prescience neither the police nor anyone else possesses. On the other hand, a standard hinging on the inner intentions of the police would fail to recognize *Miranda's* concern with the coercive effect of the "atmosphere" from the point of view of the person being questioned.

**26.** *See* Note, *Constitutional Criminal Procedure—Miranda Warnings Not Required Where There Is No Objective Determination of "Custody": Effect of Suspect's Parolee Status*, 1 W. New England L.Rev. 189, 193–96 (1977); 5 Am. J.Crim.Law 334, 342–43 (1977); 23 Loyola L.Rev. 1057, 1058–59 (1977); 57 Ore.L.Rev. 184, 187 n.20 (1977).

**27.** 429 U.S. at 493–94, 97 S.Ct. at 712–13, 50 L.Ed.2d at 718, *quoting State v. Mathiason*, 275 Or. 1, 549 P.2d 673, 674 (1976).

**28.** Justices Brennan and Stevens dissented from the summary disposition of the case. 492 U.S. at 496, 499–500, 97 S.Ct. at 714, 719, 50 L.Ed.2d at 719, 722. Justice Stevens felt that Mathiason's status as a parolee should be analyzed. Justice Marshall dissented on the merits, feeling "the coercive elements in the instant case were so pervasive as to require *Miranda*-type warnings." 429 U.S. at 498, 97 S.Ct. at 715, 50 L.Ed.2d at 721 (footnote omitted).

The Court in *Mathiason* does not articulate a test for custody. It cites the *Miranda* definition, refers to *Orozco* and *Mathis*,[29] and concludes that the questioning of Mathiason was not custodial. It does state that the police officer's lie to the defendant about his fingerprints was irrelevant to determining custody,[30] but to infuse into that sentence an analysis and rejection of the reasonable person perspective on custody is a highly questionable reading of the opinion. We decline to attribute to the United States Supreme Court, in a per curiam summary reversal, a definitive ruling on probably the most difficult question of *Miranda* implementation—the definition of custody—and a *sub silentio* overruling of a host of federal and state decisions.[31]

In a well-reasoned post-*Mathiason* decision, *State v. Paz*, 31 Or.App. 851, 572 P.2d 1036 (1977) (en banc), the court, after taking due note of *Mathiason*, followed the reasonable person test for custody and *Miranda* warnings. We think Chief Judge Schwab's characterization of *Mathiason* is accurate:

The Court there simply held that policestation interrogations of a defendant were not inherently coercive, thus requiring *Miranda* warnings.

*Id.* at 1042–43.

Furthermore, the "new" test attributed to the Court is illusory.[32] The idea that after *Mathiason*, all we have to do is determine "actual custody" or "custody in fact" and the implication that this is a new test is disingenuous. The *Miranda* test has always been custody. The problem has always been custody, or its equivalent, and how to define it.

The genesis of the "new" test seems to be the phrase in *Mathiason* that the defendant's "freedom to depart" was not restricted during the questioning.[33] The disputed cases of custody will be, of course, those situations in which the defendant did not try to leave. The courts still must determine how they will judge whether the defendant was free to leave: do they evaluate whether these particular police officers would have allowed the defendant to leave, whether this particular defendant thought he could leave, or what a reasonable defendant, reacting to the words and actions of the police officers and the situation of the interrogation, would have believed?[34] Any new label, be it "custody in fact" or "actual custody," cannot banish the very real problem of perspective.[35]

**29.** These are two previous Supreme Court decisions on custody. *See* note 18 *supra.*

**30.** 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719.

**31.** *See* note 20 *supra.*

**32.** The error in some post-*Mathiason* commentaries is, in part, the assumption that the "objective" test and the "reasonable person" or "reasonable belief" test are two separate tests. *See* Note, 1 W. New England L.Rev. at 192–96; 5 Am.J.Crim.Law at 342. Cases and commentaries on standards for custody generally equate the objective and the reasonable person standard. *See* note 20 *supra.* Theoretically, the reasonable belief test could consist of two parts—what this defendant believed, and whether that belief was reasonable. *See State v. Paz*, 572 P.2d at 1041 n.2. The literature on custody has generally not drawn a distinction between the reasonable belief and the reasonable person test, and we think it unwise to require the defendant to testify as to whether he believed he was in custody.

**33.** 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719.

**34.** There is theoretically a fourth possibility, "what the reasonable police officer would have done." This does not measure the suspect's perception (reasonable or otherwise).

**35.** The "actual" custody test seems to be one of two things. It may find custody based on evaluating what this particular police officer would have done had the defendant tried to leave. The courts would thereby judge custody based on the officer's "unexpressed intent," *Lowe v. United States*, 407 F.2d 1391, 1396–97 (9th Cir. 1969), a standard rejected by many courts. See, e. g., *United States v. Smith*, 441 F.2d 539, 540 (9th Cir. 1971) (per curiam); *Lowe v. United States*, 407 F.2d at 1397; *Williams v. United States*, 381 F.2d 20, 22 (9th Cir. 1967); *Ellington v. Conboy*, 333 F.Supp. 1318, 1323 (S.D.N.Y.1971). See also *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374, 386 (1966). The rejection of this standard is wise: the officer's undisclosed intent cannot affect the suspect's perceptions, *Lowe v. United States*, 407 F.2d at 1397; *United States v. Hall*, 421 F.2d at 544, and this standard offers no guidance to police officers because it makes the officer's own conditional intent the standard for when he or she should give *Miranda* warnings.

Like many courts, we have not before explicitly delineated a test for custodial interrogation, but our previous decisions are consistent with a reasonable person standard.[36] In *Pope v. State*, 478 P.2d 801, 805 (Alaska 1970),[37] this court said:

> The courts must determine, therefore in each case whether the atmosphere and setting of an interrogation are of such coercive effect or indicate such significant restraint as to trigger the need for a *Miranda* warning.

The standard we enunciate today provides a way to make that determination.

B. Application of the Standard:

 The inquiry in this case is whether the police, by their words or actions, led a reasonable person in Hunter's position to believe he had to take the lie detector test or had to explain the results of the test. We uphold the trial court's determination that Hunter was not in custody either before or immediately after the administration of the polygraph.

Officer Shanks testified it was his normal procedure to tell suspects they were under no obligation to take the test. Investigator Smith also testified it was his normal procedure to tell suspects they didn't have to take the test. Hunter signed a form consenting to the test and to turning the results over to the authorities. Hunter said that neither officer told him that he didn't have to take the test, but that he thought he had to take it. Hunter, however, testified that it was the officers' visits to his house and their request that he take the polygraph test, in spite of his denial of involvement with the burglary, that made him believe he had to take the test.

This record amply supports the trial judge's finding of lack of custody. The police had questioned Hunter twice at his home, only one additional time after he had denied involvement with the burglary. Such questioning was simply thorough investigation (Hunter was the prime suspect) and certainly did not constitute harassment. Both interviews were preceded by *Miranda* warnings which informed Hunter that he had a right to counsel and that he was free not to talk to the police officers. A reasonable person in the defendant's position would therefore be familiar with the concept that persons may refuse to talk to police officers and may break off questioning. It was at the second interview that the officers suggested the lie detector test. Hunter admitted the police never threatened him with any particular consequences if he didn't take the test. The trial judge heard testimony from Investigator Shanks and Smith, the polygraph examiner, of their practice to inform suspects they didn't have to take the test. Hunter was not taken to the police station but went there on his own

The alternative interpretation of "custody in fact" or "actual custody" is that custody exists when the police "in fact either restrained the suspect in response to his efforts to leave or has informed the suspect that he will be restrained if he attempts to leave." 5 Am.J. Crim.Law at 342. The suspect, however, could reasonably believe he was not free to leave, short of an express statement to that effect—a guard at the door, drawn weapons, reactions to the suspect's requests, a threatening manner of questioning, etc. This standard would permit the police to delay the explicit statement of arrest or custody, see, e. g., Commonwealth v. Sites, 427 Pa. 486, 235 A.2d 387, 390 (1967), and thus also offers no guide to which police officers may conform their actions.

36. *See Peterson v. State*, 562 P.2d 1350, 1361–62 (Alaska 1977) (defendant not in custody until his formal arrest; before that, police had done nothing to restrict defendant's freedom); *J.M.A. v. State*, 542 P.2d 170 (Alaska 1977)

(juvenile in custody during questioning—foster parent told defendant not to leave home, defendant was questioned there by foster parent, social worker and police officer, confronted with marijuana found in his jacket, and left in the custody of police officer); *cf. Blue v. State*, 558 P.2d 636, 642 n.9 (Alaska 1977) (defendant, not formally arrested, was in custody because he was not free to leave, the defendant had been frisked and, at one point, handcuffed). The holding of *Blue* was that, absent exigent circumstances, a defendant was entitled to have counsel present at a pre-indictment line-up.

37. In *Pope*, incriminating statements were admitted without *Miranda* warnings because they occurred in an on-the-scene investigation of a murder. 478 P.2d at 805. *See Miranda v. Arizona*, 384 U.S. at 477–78, 86 S.Ct. at 1629, 16 L.Ed.2d at 725–26.

because he hoped to terminate the investigation by "beating" the polygraph. He signed a form stating that he voluntarily requested the exam. There was no indication he could not have left at any time. Thus, when he came to take the test, he was not "in custody or otherwise deprived of his freedom in any significant way."

The problem in this case is that a person who lied to the police took a polygraph test because he hoped to beat it and stop the police from questioning him. If the polygraph examination indicates the suspect is lying and he makes a statement, "a 'fair state-individual balance'"[38] does not require us to find an inherent potential for police coercion so as to require *Miranda* warnings from a situation the suspect chose to place himself in.[39] In this light, we do not find Smith's brief conversation with Hunter to be custodial interrogation. Smith did nothing to indicate to Hunter that he had to explain the results, the interchange was brief, and Smith sent Hunter to Investigator Shanks who did interrogate Hunter after giving him *Miranda* warnings. During the polygraph test, there were no physical restraints placed on Hunter, nor was a guard stationed at the door of the interview room. He was permitted to leave even after giving his formal confession to Investigator Shanks. The facts of this case when compared with *Mathiason* clearly indicate that Hunter was not in custody during the period of his interview with Officer Smith so as to mandate additional *Miranda* warnings.

In situations where *Miranda* warnings are not required, a confession can still be challenged as involuntarily obtained and the product of coercion.[40] The Supreme Court in *Schneckloth v. Bustamonte* described the inquiry under the voluntariness test:

In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.

412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973) (citations omitted). In this case, there were no coercive tactics alleged such as might overcome Hunter's free will.

---

**38.** *Miranda v. Arizona*, 384 U.S. at 460, 86 S.Ct. at 1620, 16 L.Ed.2d at 715, *quoting* 8 Wigmore, Evidence § 2551 at 317 (McNaughton rev. 1961).

**39.** Hunter's situation is akin to a person who is guilty of a crime, contacts the police for purposes other than to confess, and winds up making incriminating statements. Courts generally admit these statements without *Miranda* warnings. *See United States v. Austin*, 448 F.2d 399 (9th Cir. 1971); *United States v. Hamlin*, 432 F.2d 905, 907–08 (8th Cir. 1970) (defendant contacted a postal inspector participating in mail fraud investigation); *Posey v. United States*, 416 F.2d 545 (5th Cir. 1969), *cert. denied*, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970); *United States v. Norman*, 413 F.2d 789 (6th Cir. 1969), *cert. denied*, 396 U.S. 1018, 90 S.Ct. 585, 24 L.Ed.2d 510 (1970); *Hicks v. United States*, 127 U.S.App.D.C. 209, 382 F.2d 158

(1967); *People v. Peterson*, 251 Cal.App.2d 676, 59 Cal.Rptr. 694 (1967). One commentator notes:

When a person, knowing himself to be guilty of a crime, comes to the police station to give information about that crime, it must be assumed that he has made a calculated decision to attempt to mislead the police. He has considered the risk of self-incrimination and deemed it to be less important than the possibility of clearing himself. Under these circumstances, few courts would be solicitous of his rights.

Smith, 25 S. Carolina L.Rev. at 725.

**40.** *Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1616–17, 48 L.Ed.2d 1, 8 (1976); *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760, 768 (1961); *Peterson v. State*, 562 P.2d at 1362 n.28.

Though a number of state decisions have found statements made after a polygraph test inadmissible,[41] the import of those decisions for the instant case is not entirely clear.[42] All decisions cited by the defendant were state decisions grounded in the federal constitution and occurred before the Supreme Court made clear that neither focus on the defendant nor questioning at the police station, per se, makes interrogation custodial.[43] Two recent decisions provide support for our conclusion that Hunter's post-polygraph statements are admissible.

In *People v. McCue*, 48 Ill.App.3d 41, 6 Ill.Dec. 128, 362 N.E.2d 760 (1977), the defendant was suspected of stealing money from an open cash drawer at a service station. After being advised of his *Miranda* rights, he was questioned at his home and denied guilt. The defendant stated that he was willing to take a polygraph test. He voluntarily went to the sheriff's office at a time set for the test. He and the state

examiner were alone in a room where the test was given without a fresh *Miranda* warning. At the conclusion of the test, the defendant was advised that he had flunked the examination. After further discussion lasting fifteen minutes to a half hour, the defendant confessed. He was permitted to depart after the interview. Based on *Mathiason*, the court held that the interrogation was noncustodial.[44]

In *State v. Paz*, 31 Or.App. 851, 572 P.2d 1036 (1977), the court, utilizing a reasonable person standard, found the defendant was in custody when he made statements after taking a polygraph test and learning the polygraph administrator felt he wasn't telling the truth. The factors pointed to by the court were: the suspect had been in custody the previous day; the police took the suspect to the place where the lie detector test was performed (seated in the back seat of a squad car flanked on each side by an officer); when the defendant asked the

---

**41.** *People v. Algien*, 180 Colo. 1, 501 P.2d 468 (1972); *State v. Cullison*, 215 N.W.2d 309 (Iowa 1974); *State v. Godfrey*, 131 N.J.Super. 168, 329 A.2d 75 (1974), *aff'd per curiam*, 67 N.J. 267, 337 A.2d 371 (1975); *Commonwealth v. Bennett*, 439 Pa. 34, 264 A.2d 706 (1970); *State v. Faller*, 227 N.W.2d 433 (S.D.1975).

**42.** In three of the cases, the courts arrived at different factual conclusions than we have. *See People v. Algien*, 501 P.2d at 471 (reasonable person in defendant's position would not have believed he was free to leave after polygraph test); *State v. Cullison*, 215 N.W. at 315 (defendant's statements after polygraph test not voluntary under *Schneckloth* standard); *State v. Godfrey*, 329 A.2d at 80 (statements by detectives that defendant was free to leave after polygraph test "incredible and not worthy of belief").
In *Algien* and *Cullison*, the actions of the police surrounding administration of the test differed dramatically from the case at bar. In *Algien*, the defendant initially refused to take the polygraph examination and consented when, "after several discussions with his employer . . ., it was suggested that his job might be jeopardized if he did not take the polygraph examination . . . ." 501 P.2d at 469. The employer took the defendant to the police station and, along with the officer in charge of the investigation, waited outside the door during the test. The test was given three times and after the final test, the operator questioned the defendant "at some length and, finally, defendant broke down." *Id.* at 470. In *Cullison*, the

police officer stated to a young woman who was suspected of murdering her newborn child, but who denied having been pregnant:

> To make this simple, you should submit to either a polygraph examination or medical examination and give us the results, or in the alternative we will continue to investigate leaving no stones unturned.

215 N.W.2d at 310. The defendant initially chose the medical examination, changed her mind the next day, and instead agreed to the polygraph. The undisputed nature of the police "request" was an important factor in the court's conclusion that the defendant's statements were involuntary.

**43.** The court in *Commonwealth v. Bennett* seemed to regard the fact of focus as dispositive on the question of warnings. 264 A.2d at 707. The court in *State v. Faller*, 227 N.W.2d at 435, states the investigation had focused on the defendant, though the weight of that factor alone is not clear from the opinion. That court's harsh description of the lie detector as a "psychological rubber hose" strongly suggests the court will always require *Miranda* warnings before lie detector tests, but the opinion does quote favorably language from *Schneckloth* that admissibility of confessions does not turn on "the presence or absence of a single controlling criterion . . . ." *Id., quoting* 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862.

**44.** *See also Watson v. State*, 282 Md. 73, 382 A.2d 574 (1978).

police whether he could leave, the police said he could leave the station if he revealed the nature of his involvement in the homicide; the defendant knew he was being questioned as a suspect, not a witness. *Id.* at 1042–43. Except for the last, none of the factors in *Paz* were present in Hunter's interview with the police.

■ We have found Hunter's post-polygraph statements admissible. We, however, are mindful of difficult questions arising as to the voluntariness of statements made by a suspect while or immediately after taking a lie detector test at the request of the police, and we are concerned that suspects receive adequate warnings before taking these tests. We also believe that a considerable amount of litigation and the necessity of ruling some confessions inadmissible may be avoided if the police give warnings in all cases before administering polygraph tests. We think that good practice dictates that police specifically inform suspects of their rights "to refuse to take the [lie detector] test, to discontinue it at any point, and to decline to answer any individual questions." *United States v. Little Bear*, 583 F.2d 411, 414 (8th Cir. 1978).[45] We also take this occasion to recommend to the police that full *Miranda* warnings be given in any case where it is doubtful whether the suspect taking the lie detector test is in custody.

## II. THE SENTENCING

At the time of his sentencing, Hunter was 21 years old with a ninth grade education. His parents had separated in 1972, and prior to that time, he had no trouble with the law. In 1975, while in Washington, D. C., he was convicted of offenses of burglary, grand larceny and receiving stolen property as well as petty larceny. He was placed on probation and given permission to come to Alaska. The Anchorage probation officer refused to accept supervision. Prior to sentencing, Dr. Aron Wolf found Hunter to be suffering from rather severe mental problems.

Hunter raises objections to the introduction of evidence at the sentencing hearing of additional offenses committed while on bail for which he had not yet been tried, the imposition of consecutive sentences, and the judge's implied characterization of Hunter as the worst type of offender.

Officer Kevin O'Leary of the Anchorage Police Department testified at the sentencing hearing concerning Hunter's alleged admission to having committed other burglaries while on bail from the instant charge. The burglaries involved approximately 50 weapons.[46] Apparently, Hunter had been indicted on this charge at the time of the sentencing hearing.

The Public Defender Agency, which represented Hunter, says it was "ethically foreclosed" from challenging O'Leary's testimony because the agency represented a codefendant on the weapons burglary. The superior court, determining that a conflict of interest existed, had appointed private counsel for the weapons burglary charge. That counsel was not present at the sentencing for the instant charge.

This court has often voiced its disapproval of the consideration of unverified police "contacts" in determining the appropriate

---

**45.** In *United States v. Little Bear*, 583 F.2d 411, 412–14 (8th Cir. 1978), the police asked the defendant to take a lie detector test. When she appeared to take the test, she signed forms waiving her *Miranda* rights and consenting to the polygraph test. Apparently unsettled by the polygraph apparatus, the defendant confessed just before the test was about to begin. The court found the statements were voluntary, and her waiver knowing. The court, however, was concerned about the polygraph's "often coercive impact," *id.* at 414, and prospectively adopted the limited warning requirement we also recommend.

The court in *Little Bear* took note of *State v. Henry*, 352 So.2d 643, 645–47 (La.1977). In *Henry*, the court admitted post-polygraph statements by a defendant who, prior to the examination, had been advised "that the interview could be terminated at any time upon his request." *Id.* at 647.

**46.** O'Leary also testified that Hunter told him he would shoot any police officer who discovered him in the act of burglary, unless the officer had "significant back-up."

sentence.[47] We have directed that the trial court at sentencing state on the record that it is not relying on such police contacts contained in pre-sentence reports. *Thurlkill v. State*, 551 P.2d 541, 545 (Alaska 1976). We do, however, allow the court to consider "verified information concerning additional crimes" which have not resulted in convictions.[48] The defendant must be given the opportunity to explain or admit the information.[49]

■ In the present case, the defendant was given no opportunity to explain or admit the weapons burglary allegations because his counsel for the larceny charges, who was present, was barred from comment, and his counsel in the other case was not present.[50] It is not clear from the record whether the court used the O'Leary testimony to increase the sentence.[51]

We, therefore, find it necessary to remand for resentencing to afford Hunter the opportunity to respond to any verified information that may be introduced in the resentencing procedure.

Hunter received consecutive three and one-half year sentences for the two counts of larceny from a building.[52] The first count involved the "postage meter, postage base and scale" from the Human Rights Commission. The second count involved "a Pentax Ashai Spotmatic camera and a Pentax Ashai Motordrive Unit" taken from Rem-Pak.

Hunter, who was employed as a janitor for both concerns, admitted returning after his regular work hours and taking the items from the two offices at the same time. The door between the offices was unlocked.

Appellant argues that the offenses were part of one "general transaction" under *State v. Pete*, 420 P.2d 338, 342 (Alaska 1966), and may thus not be the basis for multiple punishments.

In *Whitton v. State*, 479 P.2d 303, 312 (Alaska 1970), this court abandoned the "same-evidence" test for double jeopardy as enunciated in *Blockburger v. United States*[53] and instead directed the trial court to look to the differences in intent and conduct among the separate acts. The trial court

> would then judge any such differences he found in light of the basic interests of society to be vindicated or protected, and decide whether those differences were substantial or significant enough to warrant multiple punishments. The social

**47.** *Thurlkill v. State*, 551 P.2d 541, 544 (Alaska 1976); *Waters v. State*, 483 P.2d 199, 202–03 (Alaska 1971); *see* Erwin, "Five Years of Sentence Review in Alaska," 5 U.C.L.A.-Alaska L.Rev. 1, 15–17. Criminal Rule 32(c)(2) prohibits the inclusion of an "arrest or other police contacts" in the pre-sentence report.

**48.** *Evans v. State*, 550 P.2d 830, 847 (Alaska 1976); *Layland v. State*, 549 P.2d 1182, 1183 n.5 (Alaska 1976).

**49.** *Burleson v. State*, 543 P.2d 1195, 1203 (Alaska 1975); *Hixon v. State*, 508 P.2d 526, 527 n.1 (Alaska 1973) (per curiam).

**50.** In the sentencing hearing, the district attorney noted that he had called *Layland v. State*, 549 P.2d at 1183 n.5, to the attention of defense counsel and the court the day before the sentencing hearing. *Layland* is oné of the cases allowing information about police contacts which haven't resulted in conviction if the defendant has opportunity to respond to the information. *See* note 48 *supra*. The district attorney stated he had also sent copies of the police reports on the burglaries to the Public Defender's Office in February, five months be-

fore the sentencing hearing. Hunter's Public Defender attorney for the larceny charge apparently hadn't seen the burglary police reports and thus didn't know what information the district attorney was going to present under the *Layland* rationale.

**51.** Once the court states it considered the O'Leary testimony "in the nature of an enhancement"; once it said "there seems to be some type of enhancement of penalty suggested because of a long line of prior criminal conduct and the prima facie showing that subsequent conduct has been committed that is illegal." At another point, the court stated it was using the information "to solidify my earlier intended sentence."

**52.** AS 11.05.050 authorizes consecutive sentences.

**53.** 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). Alaska had previously followed this test. *See Selman v. State*, 406 P.2d 181, 187 (Alaska 1965); *Chambers v. State*, 394 P.2d 778, 780 (Alaska 1964).

interests to be considered would include the nature of personal, property or other rights sought to be protected, and the broad objectives of criminal law such as punishment of the criminal for his crime, rehabilitation of the criminal, and the prevention of future crimes.

*Id.* at 312. "If there are no such differences, or if they are insignificant or insubstantial, then only one sentence may be imposed under double jeopardy." *Id.*

In *Davenport v. State,* 543 P.2d 1204, 1209 (Alaska 1975), we noted concern with multiple victim robberies and explicitly approved consecutive sentences. In *Mutschler v. State,* 560 P.2d 377 (Alaska 1977), we approved consecutive sentences for two counts of assault with a dangerous weapon, each count from an assault of a different person. However, in *Thessen v. State,* 508 P.2d 1192 (Alaska 1973), the fact that fourteen persons were killed from a single act of arson could not support multiple punishments because the jury's verdict of manslaughter indicated an absence of the intent to kill anyone. In each of the fourteen counts, there was but a single intent and conduct, that involved in the commission of arson.

■ Here, the acts did involve the intent to steal from separate owners and the conduct of stealing separate items from each of the owners. There is a sufficient difference in intent and conduct so that separate punishments would not impose double jeopardy. Nevertheless, in resentencing Hunter, the court should consider that there was one continuous transaction involving the thefts of a postage meter and scale from one office and a camera and motordrive from an adjacent unlocked office. For sentencing purposes, the offenses do not, to the same degree, violate the interests of society as where larcenies are committed on different occasions and in separate locations.[54] This should be considered by the court in resentencing Hunter.

In a final claim of error, appellant asserts that the trial court considered him the worst type of offender based on impermissible criteria.[55] The trial court referred to Hunter as a "bantam rooster" and a "stud," in part based on the pre-sentence and psychiatric report which indicated that Hunter may have committed some crimes in order to gain notoriety among his peers.[56]

■ Appellant claims that these characterizations indicate a racial and sexual stereotype. Hunter is black. We do not believe that any such intent was present in the remarks of the trial judge, but trial courts are admonished to avoid unnecessarily derogatory language in sentencing.[57]

The conviction is AFFIRMED, and the case is REMANDED for resentencing.

**RABINOWITZ, J., dissenting in part.**

---

54. Appellant also argues that the court used the consecutive sentences to effectively impose a seven-year term, the maximum allowed under AS 11.20.150, larceny in a building. Appellant then argues that the maximum sentence for any given crime is to be imposed only on the "worst type of offender," *Galaktionoff v. State,* 486 P.2d 919 (Alaska 1971), and that Hunter, despite his prior record, cannot be so characterized.

55. The trial court did not expressly characterize Hunter as the worst type of offender, but appellant argues that characterization is implicit in the trial court's comments, quoted at note 56 *infra.*

56. THE COURT: Now, Mr. Hunter, I think there's something drastically wrong with you. And I don't know whether it's entirely mental. I can't tell entirely from the psychiatric report whether it is in fact a mental defect or whether or not it's a personality disorder, whether because of your own personality you want to be a big shot, and therefore you commit these offenses without rhyme or reason, but merely to look big in the eyes of your peers, people that you know, so that perhaps you can strut around like a bantam rooster and thrash your tail and raise your comb and show what a wonderful young stud you are. Now, that may be one reason why you do this. Had you considered that?

57. The remarks could apply to one of any race. Although we do not believe that the judge's remarks were racially motivated, we also take this opportunity to indicate this court's abhorrence of any inequality in sentencing based on racial differences.

**904**

RABINOWITZ, Justice, dissenting in part.

I concur in the court's resolution of all issues in this appeal with the exception of Hunter's final specification of error in which it is asserted that the superior court employed impermissible criteria in characterizing him as a worse type of offender. In my opinion, the questioned sentencing remarks of the superior court are ambiguous and capable of the construction advanced by Hunter. Thus, out of an abundance of caution and in recognition of the importance of the appearance of impartiality in sentencing proceedings, I would require that upon remand the case be reassigned to another superior court judge for resentencing.