**Robin J. HAAS, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–4703.

Court of Appeals of Alaska.

June 23, 1995.

Thomas A. Ballantine, III, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchor-age, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

COATS, Judge.

Robin J. Haas was convicted, following a jury trial, of three counts of murder in the first degree, two counts of attempted murder in the second degree, and robbery in the first degree. AS 11.41.100(a)(1)(A); AS 11.41.110(a)(1); AS 11.31.100; AS 11.41.500(a)(1). Superior Court Judge Milton M. Souter sentenced Haas to 249 years of imprisonment. Haas appeals, arguing that Judge Souter erred in denying Haas' motions to suppress statements which he made to the police and other evidence which was based on those statements. Haas also appeals his sentence. We conclude that Judge Souter erred in denying Haas' suppression motion, and accordingly remand the case to the trial court for further proceedings.

In the early morning hours of January 8, 1991, an unknown assailant shot five people in a room at the Mush Inn in Anchorage. The police responded to a report of the shooting and found that three of the victims were dead and two others were severely injured. In the room where the shooting occurred, the police found shell casings from a .9 millimeter semiautomatic pistol and concluded that this was the weapon used in the shooting.

Leslie Piland, one of the victims who survived the shooting, told the police that the assailant's name was "Rocket." She described him as a white male with curly hair who looked like a "fat or chubby Richard Simmons." She was able to give the police a telephone number for the assailant. The police also talked to a cab driver who told them that he believed that the particular room where the shooting took place was being used to sell crack cocaine. The cab driver told the police that he had previously picked up a male passenger by the name of

"Rocky" who had talked about doing violence in that room. The cab driver recalled that Rocky was accompanied by a woman. At this point in the investigation, the police concluded that the perpetrator might be an individual by the name of Roscoe H.

The police used the telephone number which Leslie Piland gave them to obtain a particular address on Jennifer Street. The police immediately stationed several officers outside of this address. At about eight o'clock that same morning, several police officers knocked on the door. Robin Haas answered the door and identified himself. When the police stated that they were looking for "Rocket," Haas told them that he sometimes went by that name. Haas also generally fit the description which Piland had given the police. Haas invited the officers into his house and agreed to go down to the police station with them. At the time that the police contacted Haas, Haas' girlfriend and another person were also at the residence.

Police Investigator Michael Grimes asked Haas if Haas would drive his own truck down to the station so that he would be able to drive himself back home after the police interviewed him. Investigator Grimes later testified that at this point he was only following up on a lead and that Haas was not a suspect. He stated that the information connecting Haas with the scene of the crime came from a severely wounded victim and he was not sure what the information meant. He considered Haas to be very open, cooperative, and disarming. Grimes contacted Investigator Bill Reeder at the police station to set up the interview room with video and audio equipment.

At the police station, Grimes and Reeder interviewed Haas; Reeder was the principal interviewer. Although neither officer was in uniform, both were armed. However, Grimes testified that his weapon would have been covered by his clothing. According to Grimes, Haas appeared to understand the questions asked of him and his answers made sense. Haas also did not appear to be under the influence of any drugs or alcohol. Grimes left the interview room several times and sat in on the interview of Haas' girlfriend who was also at the station talking to another officer.

At the onset of the interview, Reeder told Haas that he was not under arrest, that he was there of his own free will, and that he was free to leave at any time. Haas told the police that he was at the Mush Inn with the victims and bought a gram of cocaine from them. Initially, Haas denied any involvement in the shooting. However, as the interview progressed, Haas stated that he strongly disliked the people at the Mush Inn because they were drug dealers. He said that he disliked the individuals because they had gotten his girlfriend "doped up." Haas began talking with Reeder about what might happen, hypothetically, if he admitted to being involved in the shootings. Haas indicated his belief that "a guy would still go to jail for that." Reeder responded that he could not say that "it would never happen" and that he was not in a position to make any promises. He told Haas that it was in Haas' interest to be truthful and to give his side of the story. In response to Haas' question whether Reeder was going to put him in jail "today," Reeder assured him, "I'm not going to arrest you today. That is not to say you won't be arrested." Haas then hypothetically suggested his involvement in the homicides and asked, "[A]re you gonna take me to jail right now ... arrest me?" Reeder did not give him a direct answer.

Eventually, Haas admitted that he did the shooting and stated that he was doing the police a favor because the people he shot were "scum." After Haas made this statement, he once again asked if he could walk out of the station and go home. Reeder responded, "I really don't ... know, I'm just a peon, okay?" Reeder told Haas that his supervisors would make that decision but that he personally had no problem with Haas leaving.

Reeder did not check with his supervisors immediately. He encouraged Haas to give

him more information about the details of the shooting. Haas then asked if he needed a lawyer. Reeder responded that it was up to Haas, that a lawyer would tell him not to say anything, and that if Haas wanted a lawyer then Reeder would stop the questioning. Reeder told Haas that although Haas was initially told he was free to leave, Reeder would have to check and make sure that Haas could go home.

Reeder and Haas continued talking about the gun, Haas' girlfriend, and Haas' making a telephone call. Reeder then went out to check if Haas' girlfriend was still at the police station. When he returned, he stated that he had talked to the district attorney who was at the station that morning and told Haas that he was free to leave. Reeder explained to Haas that he was going to get a search warrant for his house and truck. Therefore, Haas could not return to his house or drive away in his truck, although he was free to leave the police station. Reeder gave Haas a pager number so that he could get in touch with the police officers, and ended the interview.

After Haas left the station, the police obtained warrants to search Haas' house and truck, for Haas' arrest, and for Haas to submit to a forensic examination. The police arranged to meet Haas at his residence and arrested him there. A grand jury later indicted Haas for murder, attempted murder, and robbery.

On June 21, 1991, Haas moved to suppress the statements which he made to the police at the police station on January 8, 1991, and all of the evidence derived from those statements. In his suppression motion, Haas contended that he was in custody at the police station and that therefore the police were required to give him *Miranda* warnings. He contended that since the police had not given him *Miranda* warnings, Judge Souter was required to suppress all of the statements which Haas made to the police and all evidence derived from the statements. Following an evidentiary hearing, Judge Souter denied Haas' motion. Judge Souter concluded

that Haas was not in custody when the police questioned Haas at the police station on January 8, 1991.

The United States Constitution requires that a suspect be advised of his fifth and sixth amendment rights before "custodial interrogation":

> By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

The leading case in Alaska for determining whether a person is in custody is *Hunter v. State,* 590 P.2d 888 (Alaska 1979), in which the supreme court articulated an objective reasonable person standard. Under *Hunter,* a person is in custody when the police say or do something "such that a reasonable person would feel he was not free to leave and break off police questioning." *Id.* at 895. The court stated:

> At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* at 895 (footnotes omitted).

Judge Souter found that Haas was not in custody when he came to the police station.

The testimony of the police officers, which Judge Souter found credible, established that Haas volunteered to come to the station and be interviewed. Haas drove his own truck to the police station. At the beginning of the interview, Investigator Reeder told Haas that he was not under arrest and that he was free to leave at any time. Based on this evidence, Judge Souter could properly conclude that Haas was not in custody at that time.

However, during the course of the interview, Haas began to broadly hint that he was the one who had committed the homicides. While he did not at first explicitly confess to the killings, he posed "hypothetical" situations which strongly suggested his guilt. After Haas had made several inculpatory statements, he asked the officer, "[A]re you gonna take me to jail right now ... arrest me?" Officer Reeder refused to answer Haas directly. A few minutes later, Haas repeated his question. This time, Reeder replied, "I really don't know. I'd have to check ... with my sergeant [and] with the district attorney."

We believe that the superior court erred in determining that a reasonable person in Haas' position would have felt free to leave at this point. Haas was therefore in custody for *Miranda* purposes. Although the police ultimately told Haas that he was free to go, there was a substantial period of time when Haas was subjected to custodial interrogation without being advised of (and waiving) his *Miranda* rights. That portion of the interview was obtained illegally. Judge Souter should have suppressed all of Haas' statements from the point when Haas asked the question, "[A]re you gonna take me to jail right now ... arrest me," and all fruit of these illegally obtained statements.

We therefore REMAND this case to the superior court. Judge Souter must now determine what additional evidence, if any, should be suppressed as the fruit of the illegally obtained statements. After determining what evidence should be suppressed, the superior court must decide whether Haas is entitled to a new trial—that is, whether the use of the illegally seized evidence at trial amounted to harmless error beyond a reasonable doubt. After making these determinations, the trial court should make findings and forward them to this court. We retain jurisdiction of this appeal.